HARTMAN v. JOHN D. PARK & SONS CO.

(Circuit Court, E. D. Kentucky. February 14, 1906.)

No. 2,440.

1. PROPERTY—SECRET PROCESS—INCIDENTS OF OWNERSHIP.

The patent and copyright statutes, in conferring upon an inventor or author the exclusive right to make use and sell articles embodying his invention or authorship, create in him a new right and do not extend or continue a previously existing right. The owner of a secret process, not patented, has no such exclusive right to make, use, and vend the article to which it relates, but he has the right to keep his knowledge to himself and to protection of the same as a property right against one, who, in violation of contract or through a breach of trust or confidence, undertakes to apply the secret to his own use or to impart it to others.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Property, § 2. Disclosure of trade secrets, see note to S. Jarvis Adams Co. v. Knapp, 58 C. C. A. 8.]

2. SALES—RIGHT TO RESTRICT FUTURE SALES—EFFECT OF PATENT.

The owner of a patent or copyright after an absolute sale of the article covered thereby may, by virtue of the exclusive right given him by statute, and his right to withhold or restrict licenses under his monopoly, retain control of future trade in the article sold, as to prices of resale, etc., irrespective of any condition in the contract of sale, but the right to reserve such future control by contract is not derived from the statute, but exists if at all by the common law, and may as lawfully be exercised by the seller of an unpatented article.

3. CONTRACTS—RESTRAINT OF TRADE—SALE OF ARTICLE MADE BY SECRET PROCESS.

Provisions in a contract for the sale of a secret process restraining its use or its communication to others are not invalid as in restraint of trade, because necessary to protect the property right in the subject-matter of the contract, but such considerations do not apply to contracts for the sale of the article produced by such process which are subject to the same rules as contracts for the sale of any other article of manufacture.

4. SAME.

A system of contracts made by the manufacturer of a proprietary medicine between him and wholesale dealers, to whom alone he sold his medicine, by which they were bound to sell only at a certain price and to retail dealers designated by him, and between him and the retail dealers by which, in consideration of being so designated, they agreed to sell to consumers only at a certain price, is not unlawful as in restraint of trade, but

is a reasonable provision for the protection of the manufacturer's trade, and he is entitled to an injunction to restrain a defendant from inducing other parties to such contracts to violate the same.

In Equity.   On demurrer to bill.

F. W. Hinkle, F. F. Reed and E. S. Rogers, for plaintiff.
W. J. Shroder, Alton B. Parker, Morris & Fay, for defendant.

COCHRAN, District Judge.   This case is before me on demurrer to the bill for want of equity.   The bill alleges in substance that complainant is the manufacturer and seller amongst other medicines of one known as "Peruna"; that the formula by which it is made was discovered by him, and is known only to him and his trusted employés; that he puts it up in bottles, each of which is inclosed in a loose white wrapper bearing the words "Peruna the Great Tonic" and has pasted on it a label giving its history, the theory upon which it is based, the ailments for which it is recommended, and the directions for taking it, and is serially numbered, the number being stamped both on the wrapper and label in several places; that he sells the medicine to wholesale druggists only, who in turn sell to retail druggists, who in turn sell to consumers; that the wholesalers to whom he sells contract with him not to resell except to retailers designated by him and at certain prices, and the retailers whom he designates contract with him not to resell to consumers except at certain prices; that his prices to the wholesalers are uniform and so are the prices fixed by him of wholesalers to retailers and of retailers to consumers; that he alone advertises the medicine and creates the demand for it; that with each package of medicine is furnished a card containing the serial numbers of the bottles therein and the wholesalers are required to note thereon the retailers to whom same is sold, and to return it to complainant; that the defendant, a Kentucky corporation, is a wholesale druggist; that it obtains said medicine from complainant's wholesalers and retailers by false and fraudulent representations, surreptitious, and dishonest methods and persuading them to break their contracts with him, and sells same to retailers operating "cut rate drug stores" at less than the wholesale prices fixed by him, who in turn sell to consumers at less than the retail prices so fixed; that before the medicine is so sold to consumers the wrappers are removed and the labels are defaced so as to obliterate the serial numbers stamped thereon and the information thereby given; and that defendant gives out and announces that he will continue so to obtain said medicine and so dispose of it.   The relief sought is an injunction against his so doing.

The defendant's contention is that complainant has no right to sell his medicine outright to the wholesalers, and at the same time retain a control over the subsequent trade therein as to the retailers to whom and prices at which the wholesalers may resell and as to the prices at which the retailers may resell to the consumers, and that, hence, the system of contracts by which he is attempting to retain such control is unlawful.   It concedes that if this contention is not correct the complainant is entitled to the relief he seeks.   The demurrer, therefore,

presents for determination the single question as to whether this contention is correct. Its counsel advance two arguments in support thereof. The first one presupposes that the owner of a patent or copyright has the right to sell the things patented or copyrighted outright, and, at the same time by such system of contracts, retain such control over the subsequent trade therein. It is that such owner has such right by virtue alone of the federal statutes as to patents and copyrights, and that as there is no statute giving any rights to the owner of a secret process he does not have such right. The argument has some plausibility and has bothered me somewhat—less, however, in concluding that it is not sound than in demonstrating that it is not in a lucid and convincing way, which I have aimed to do. In order to determine its validity it should be ascertained first what rights the owner of a patent or copyright has by virtue alone of the statutes as to patents and copyrights. They in express terms confer the exclusive right to make, use, and sell the things patented or copyrighted. Unquestionably the owner of a patent or copyright has this right by virtue alone of said statutes. It arises solely therefrom. If it were not for them he would not have the right. No other person has any such right in relation to any. other articles. Complainant's counsel hesitate to concede this, if they do not actually dispute it. They contend, in effect, that an inventor or author who has not obtained a patent or copyright has, before publication, such right in relation to articles embodying his invention or authorship and that the owner of a secret process who may be an inventor and entitled to a patent, and who is in exactly the same position as an inventor or author who has not obtained a patent or copyright before publication has such right in relation to articles embodying his secret process. As to the former they say that he has precisely the same rights which an inventor or author who has obtained a patent has. To make sure of this I quote from their brief. They say:

"It is therefore proposed—to show that in case of inventors and authors—precisely the same exclusive monopolistic and all controlling property rights in inventions and literary products subsisted at common law before publication as are given by statute after publication. The right given by the federal copyright statute is the exclusive right to print, publish and sell the production. The right given by the patent statutes is the exclusive right to make, use and vend the invention. At common law and by natural right the author of a book or the discoverer of an improvement in machinery, art or manufacture has precisely the same rights before publication."

Again they say:

"The common-law right and the statutory right are identical in their natures."

As against these views many expressions from learned judges can be quoted. As for instance, in the case of Wheaton v. Peters, 8 Pet. (U. S.) 591, 8 L. Ed. 1055, Mr. Justice McLean, in referring to the federal statutes as to copyrights, said:

"Congress then by this act instead of sanctioning an existing right as contended for created it."

And in the case of Gayler v. Wilder, 10 How. (U. S.) 477, 13 L. Ed. 504, Mr. Chief Justice Taney said:

"The inventor of a new and useful improvement certainly has no exclusive right to it until he obtains a patent. This right is created by the patent."

And again in the case of In re Brosnahan (C. C.) 18 Fed. 62, Mr. Justice Miller said:

"The sole object and purpose of the laws which constitute the patent and copyright systems is to give to the author and inventor a monopoly of what he has written or discovered, so that no one else shall make or use or sell his writings or his invention without his permission; and what is granted to him is the exclusive right; not the abstract right but the right in him exclusive of everybody else."

Concerning these expressions complainant's counsel say:

"All that is meant or intended to be meant, when various courts have said that copyright and patent laws create new rights, must be simply that these statutes have continued and extended the old rights after publication or disclosure."

In this line they frequently speak of the rights of an inventor or author who has obtained a patent or copyright as being an extension, protraction, continuance, or prolongation of the rights he had in the absence of publication before he obtained his patent or copyright. Counsel for defendant, though taking issue here with complainant's counsel, at times use language implying what they contend. They speak of an inventor or author losing his exclusive right by publication and of his preserving it by obtaining a patent or copyright. I cannot concur in this contention. An inventor or author who has not obtained a patent or copyright does not have before publication the exclusive right to make, use, and sell articles embodying his invention or authorship. Nor does the owner of a secret process have exclusive right to make, use, and sell articles embodying his secret process. The statutes as to patents and copyrights in conferring upon an inventor or author the exclusive right to make, use, and sell articles embodying his invention or authorship create in him a new right, and do not extend, protract, continue, or prolong a previously existing right. An inventor or author who has not obtained a patent or copyright, has, before publication, a valuable right of another kind. He has the right to keep the knowledge of what he has invented or composed to himself. No one can lawfully obtain it from him without his consent. So, likewise, the owner of a secret process has the right to maintain the secrecy of his process. Both such an inventor or author and such owner have a right to sell their knowledge and their right to keep it a secret to another and vest him with the same rights in regard thereto as he has. They have the right to impart the knowledge to others with restrictions as to the use they shall make of it, and to have them make no greater use of it. Such knowledge as well as the articles embodying it is property, and entitled to the protection of the courts. From a commercial standpoint, the owner of a secret process may be in as good a position, if not better, than an inventor or author who has obtained a patent or copyright. But the exclusive right to make, use, and sell articles embodying his invention or au-

thorship which such an inventor or author has is not the same as the right to secrecy which the owner of a secret process or an inventor or author who has not obtained a patent or copyright has before publication. The two rights are entirely distinct.

In the case of Peabody v. Norfolk, 98 Mass. 452, 96 Am. Dec. 664, Judge Gray said:

"If one invents or discovers and keeps secret a process of manufacture, whether a proper subject for a patent or not, he has not indeed an exclusive right to it as against the public or against those who, in good faith, acquire knowledge of it; but he has a property in it which a court of chancery will protect against one who in violation of contract and breach of confidence undertakes to apply it to his own use or to disclose it to a third person."

In the case of Chadwick v. Covell, 151 Mass. 190, 23 N. E. 1068, 6 L. R. A. 839, 21 Am. St. Rep. 442, Judge Holmes said, with reference to a secret formula for making a medicine, that the owner thereof "had not the exclusive right to the use of the formula. His only right was to prevent any one from obtaining or using them through a breach of trust or confidence."

In the case of Tabor v. Hoffman, 118 N. Y. 31, 23 N. E. 12, 16 Am. St. Rep. 740, Judge Vann said:

"If a valuable medicine not protected by patent is put upon the market any one may, if he can by chemical analysis and a series of experiments or by any other use of the medicine itself aided by his own resources, discover the ingredients and their proportions. If he thus finds out the secret of the proprietor he may use it to any extent that he desires without any danger of interference by the courts. But because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk who in the course of his employment has aided in compounding the medicine and had thus become familiar with the formula. The courts have frequently restrained persons, who have learned a secret formula for compounding medicines, beverages and the like, while in the employment of the proprietor, from using it themselves or imparting it to others, to his injury."

And in the case of Vulcan Detinning Co. v. American Can Co. (N. J. Ch.) 58 Atl. 290, Vice Chancellor Reed said:

"A patent protects its owner and his assignees and licensees against every one infringing it, while a trade secret protects its owner only against those who have learned the secret under a contractual or confidential obligation."

It must be accepted, therefore, as true that as to the exclusive right which the statutes as to patents or copyrights confer the owner of a patent or copyright has it by virtue alone of said statutes. It arises solely therefrom. If it were not for them he would not have it. And no other person has any such right in relation to any other articles. This right, however, is not the same as the right in question; that is, the right on the part of the owner of a patent or copyright to sell the things patented or copyrighted outright, and at the same time by a system of contracts similar to that involved herein retain control over the subsequent trade therein. As counsel for defendant say the two are essentially different. And this exclusive right is the only right which those statutes in express terms confer. It follows, therefore, that, if the owner of a patent or copyright has the right to sell the things patented or copyrighted and at the same time by such a

system of contracts retain control over the subsequent trade therein by virtue alone of said statutes, he does not have it directly therefrom. Said statutes do not in express terms confer it upon him. If he has it at all, he must come by it indirectly; that is, through said exclusive right. It must grow out of that right. And it must be conceded that if it does grow out thereof that he has it by virtue alone of said statutes, just as much so as he has the exclusive right by virtue alone thereof, which we have heretofore demonstrated. The question I have been considering, then, simmers down to this: Does the right which it is presupposed the owner of a patent or copyright has—that is, the right to sell the things patented or copyrighted outright, and at the same time by a system of contracts similar to that involved herein retain the control over the subsequent trade therein as to retailers to whom and prices at which the wholesalers may resell, and as to the prices at which the retailers may resell to the consumers—grow out of the exclusive right which those statutes confer, and which the owner of a patent or copyright has by virtue alone thereof?

To answer this question correctly it is essential that we look more deeply into this exclusive right so conferred, and ascertain its exact nature. No better definition of the nature of this exclusive right which the owner of a patent has by virtue alone of the statutes as to patents can be found than in these words of Mr. Chief Justice Taney, in Bloomer v. McQuewan, 14 How. (U. S.) 539, 14 L. Ed. 532, to wit:

"The franchise which the patent grants consists altogether in the right to exclude every one from making or using or vending the thing patented, without the permission of the patentee. This is all he obtains by the patent."

In other words, the right is the right to prevent every one from making, or using, or selling the thing patented without his consent. Or, to put it differently, it is the right to sue any one who so makes, uses, or sells the thing patented. It is not the right to make, or to use, or to sell the thing patented. That he has the right to do irrespective of the statute by virtue of the common law. That it is the former right, and not the latter which the statute grants, and the patentee has by virtue thereof, is pointed out in these words of Mr. Justice Harlan in Patterson v. Kentucky, 97 U. S. 506, 24 L. Ed. 1115, to wit:

"The right to sell the Aurora oil was not derived from the patent; that right existed before the patent, and unless prohibited by valid local laws could have been exercised without the grant of the latter's patent. The right which the patent primarily secures is the exclusive right in the discovery, which is an incorporeal right, or in the language of Lord Mansfield, in Millar v. Taylor, 4 Burr. 2303, 'a property in notion' which has no corporeal tangible substance."

Having the right to prevent every one else from making, using, or selling the thing patented, he has the right to permit any one else to make, use, or sell it. This right to license does not exist by virtue of the statute. It is a common-law right. In the case of United States v. American Bell Telephone Co. (C. C.) 29 Fed. 17–43, Judge Jackson said:

"The right of the patent owner to permit or license the use of the invention is not the creature of the federal franchise or statute, but of the common law."

Just as the exclusive right of the owner of the patent has been defined as the right to sue any one who makes, uses, or sells the thing patented, so the grant of a license to another by the owner of the patent may be said to be a grant of the right not to be sued for making, using, or selling the things patented.

Judge Lurton, in Heaton Peninsular Button Fastener Co. v. Eureka Specialty Co. (77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728), said:

"It has been said that the sole matter conveyed in a license is the right not to be sued."

Still further, it is to be noted that what the owner of a patent has a right to prevent every one else from doing, and to sue him if he does it, is either one of three separate and distinct things, to wit, making the thing patented, using the thing patented, or selling the thing patented. Likewise, the common-law right of doing which the owner of the patent has is of doing either one of these three things. And the like right of licensing others to do which the owner of the patent has is to make the thing patented, to use the thing patented, or to sell the thing patented. The statutory exclusive right of prevention and suing consists of these three separate and distinct things, and the common-law rights of doing and licensing to do consists also of these three separate and distinct things.

In the case of Adams v. Burke, 17 Wall. (U. S.) 453, 21 L. Ed. 700, Mr. Justice Miller said:

"The right to manufacture, the right to sell, and the right to use are each substantial rights, and may be granted or conferred separately by the patentee."

Hence, the patentee may license another simply to make the thing patented. If he licenses him to do no more he has no right to use or to sell the thing patented. He simply acquires title to the thing patented if he makes it under the license. He can neither use nor sell it. Walker on Patents, § 297, says:

"It is not to be presumed that a right so nugatory as a bare right to make was the only subject of a license for which a valuable consideration was paid."

But it is possible that the license may go no further and it is conceivable that a patentee might grant no greater license. So, in addition to licensing such other person to make the thing patented, he may license him to use it, or to sell it, or to both use and sell it. If he licenses him to use it only, he has no right to sell it, and if he licenses him to sell it, he has no right to use it. Again, the owner of the patent may, instead of licensing another to make the thing patented, make it himself, and sell it to such other person. If the sale covers the entire transaction, the purchaser acquires the title to the thing patented, but he can do nothing with it. He can neither use nor sell it, just as in the case of one who makes the thing patented under a license so to do only. Here, as there, it is not to be presumed that such is the entire transaction, but it is possible that it may be so, and it is conceivable that one might so limit it. The presumption, however, is, nothing else appearing, that the purchaser is licensed to either use or sell it. But there may be an express license simply to

use it, in which case he has no right to sell it, or it may be simply to sell it, in which case he has no right to use it. If he is licensed expressly or impliedly to both use and sell it, the thing patented is said to pass outside of the monopoly created by the statute, just as if he is licensed to make the thing patented and also to use and sell it. Whenever a licensee is limited to doing one or two of the three things which he may be licensed in relation to or with the thing patented, and he does one or two of the three things, as the case may be, which he is not licensed to do, he invades the exclusive right of the patent owner, and infringes the patent, just as much so as if he had had no license at all, and had done such thing or things. But such are not the only limitations which a patent owner may put upon his license. The limitations so far considered have to do only with the three fields of operation, to wit, making, using, and selling the thing patented. He may limit the licensee as to what he may do with the thing patented in either one of these separate fields of operation. He may limit the licensee as to when, and how, and the extent to which he may make the thing patented. He may limit the licensee as to when, and how, and the extent to which he may use the thing patented. He may limit the licensee as to when, and how, and to the extent to which he may sell the thing patented. If he so limits the licensee in any particular field of operation, and the licensee exceeds the limitations in that field, even though he does not go outside thereof into any other field, he invades the exclusive right of the patent owner, and infringes the patent, just as much so as if he had had no license at all, and had done the things which exceed the license.

We come, then, to this. The owner of a patent may make the things patented himself, and sell them to others and license such others to resell them, but may limit the license to resell to such persons as he may designate and at certain prices and the license of such persons to resell to others at certain prices. If he does so, and the first purchasers exceed the license either by selling the things licensed to persons other than those they were licensed to sell to or by selling at different prices from those at which they were licensed to sell at or the second purchasers exceed the license by selling the things licensed at different prices from those at which they were licensed to sell at, then, in either case, the purchasers so exceeding the license invade the patent owner's exclusive right, and infringe the patent. That this is so is established by several recent decisions. They are: Edison Phonograph Co. v. Kaufmann (C. C.) 105 Fed. 960; Same v. Pike (C. C.) 116 Fed. 863; Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58; National Phonograph Co. v. Schlegel, 128 Fed. 733, 64 C. C. A. 594.

The first three of these cases are cited and relied on by defendant's counsel as supporting their contention herein that the owner of a patent or copyright has the right to sell the things patented or copyrighted, and, at the same time, by a system of contracts similar to that involved herein, retain such control over the subsequent trade therein. In the first two cases the complainant was the same. It was the owner of patents for phonographs and phonograph records which it made and

sold for resale. It sold only to jobbers and to them only under what was called a "Jobber's Agreement." That agreement contained a limitation as to the prices at which and the dealers to whom the jobbers could resell the things patented; the latter being dealers who would sign an agreement containing a limitation as to the prices at which they could resell to users, and who were not on their suspended list. In the Kaufmann Case, a dealer who had purchased certain of the things patented from one who had purchased them from complainant under a jobber's agreement with notice of the dealer's prices, but who had not signed a dealer's agreement was reselling them at cut prices; that is, at less than dealers' prices. In the Pike Case, a jobber resold to a dealer who had not signed a dealer's agreement, but who knew of the limitations in the jobber's agreement as to the persons he could sell to. It was held in each case that there had been an infringement of the patent, and that the complainant was entitled to an injunction; in the one case restraining defendant from selling at less than dealer's prices and in the other case from selling at all.

In Victor Talking Machine Co. v. The Fair, the complainant was the owner of a patent for gramophones which it made and sold for resale. On each gramophone which it sold was a notice limiting dealers from selling it to the public at less than a certain price. The defendant, a proprietor of a department store purchased certain of such gramophones from a jobber with notice of the limitation, and was reselling them to the public at less than the fixed price. It was held that he was infringing the patent, and that complainant was entitled to an injunction restraining him from so doing. Judge Baker said:

"By its terms the grant covers three separate or separable fields. The patentee may agree with one that he will not exclude him from making, with another from using, and with yet another from selling devices that exemplify the principles of his invention. Within the field of making, it has never been doubted, so far as we are aware, that he may subdivide as he pleases and offer to sell or lease in the most fanciful parcels on the harshest terms; that whether purchasers and tenants come or not is purely his own concern; and that, if purchasers or tenants do not come, the courts will enforce the terms of the sale or lease. And how could it be otherwise. Owning the whole, he owns every part. The field being his property, and there being no law for seizing it and adjudging his damages, he cannot be compelled to part with his own except 'on inducements to his liking. The same conditions must prevail within the field of use, for how can it be distinguished? And the Circuit Court of Appeals for the Sixth Circuit, in a case we thoroughly approve (Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728), has ruled that a patentee may farm out such a part of the field of use as he pleases, and retain the balance and that whoever without permission enters the reserved portion is an infringer. This case has been followed and approved by the Circuit Court of Appeals for the Second Circuit in Cortelyou v. Lowe, 111 Fed. 1005, 49 C. C. A. 671. The field of sale is as much within the monopoly as the others, and so it has been decided. Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. And in Edison Phonograph Co. v. Kaufmann (C. C.) 105 Fed. 960; and Same v. Pike (C. C.) 116 Fed. 863, the holdings were that a patentee may reserve to himself as an ungranted part of his monopoly of sale the right to fix and control the prices at which jobbers and dealers may sell the patented article to the public, and that whoever without permission enters the reserved portion is an infringer."

In National Phonograph Co. v. Schlegel, the complainant was the exclusive licensee for sale of the complainant in the two Edison Phonograph Company cases. It carried on the business of selling phonographs to jobbers under the same system of agreements, as stated, in giving the facts of those cases. A jobber who had purchased certain of the things patented under a jobber's agreement was selling them at less than the prices stipulated, and to dealers who did not sign the required dealer's agreement. It was held that complainant was entitled to an injunction against the jobber restraining him from so doing. The complainant, though merely an exclusive licensee for sale, was treated as in the position of the patentee. Judge Vandevanter said:

"This is not a suit by the patentee or an assignee to enjoin the infringement of a patent, but it is a suit by an exclusive licensee for sale of articles embodying the patented invention or discovery to restrain the future violation of an under license or contract for the sale of such articles by a sublicensee. However, the validity of the under license or contract and the right of the licensee to restrain the future sales in violation thereof must necessarily be determined by the patent laws and by the rules applicable to a suit by a patentee or an assignee to enjoin the infringement of the patent."

And again he said:

"An unconditional or unrestricted sale by the patentee or by a licensee authorized to make such sale of an article embodying the patented invention or discovery passes the article without the limits of the monopoly and authorizes the buyer to use or sell it without restriction; but to the extent that the sale is subject to any restriction upon the use or future sale the article has not been released from the monopoly, but is within its limits, and as against all who have notice of the restriction is subject to the control of whoever retains the monopoly. This results from the fact that the monopoly is a substantial property right conferred by law as an inducement or stimulus to useful inventions and discovery, and that it rests with the owner to say what part of this property he will reserve to himself and what part he will transfer to others and upon what terms he will make the transfer."

These four cases, which all had to do with limitations within the field of selling were based upon the earlier and notable case of Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co. (77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728), which had to do with a limitation within the field of using. The complainant was the owner of a patent for machines to fasten buttons to shoes. To do their work it was necessary to use, in connection with them, staples adapted thereto, but which anybody could make. Complainant sold the machines through jobbers to purchasers for use, attaching to each machine a metal plate on which was expressed a limitation as to its use, that it was to be used only with staples made by it. The defendant was charged with persuading users of such machines to purchase from it staples not made by complainant for use therewith. It was held that such users were infringers of the patent, and the defendant a contributory infringer thereof, and that complainant was entitled to an injunction against defendant, restraining it from continuing so to do, notwithstanding thereby complainant was given a monopoly in staples adapted for use with such machines. Judge Lurton said:

"The buyer of the machine undoubtedly obtains the title to the machine embodying the invention, subject to a reverter in case of violation of the conditions of the sale. But, as to the right to use the invention, he is obviously a mere licensee, having no interest in the monopoly granted by the letters patent. A license operates only as a waiver of the monopoly as to the licensee, 'and estops the licensor from exercising the prohibitory powers in derogation of the privileges conferred by him upon the licensee.' Rob. Pat. §§ 806-808. * * * A licensee is one who is not the owner of an interest in the patent, but who has, by contract, acquired a right to make or use or sell machines embodying the invention. Gayler v. Wilder, 10 How. (U. S.) 477, 13 L. Ed. 504; Oliver v. Chemical Works, 109 U. S. 75, 3 Sup. Ct. 61, 27 L. Ed. 862; Rob. Pat. §§ 606-608. Alienations of a mere right to use the invention operate only as licenses."

Again he said:

"The control reserved by the patentee as to the use of the machine has the effect of continuing it within the prohibitions of the monopoly. The license defines the boundaries of a lawful use, and estops the licensee from the assertion of his monopoly contrary to its terms. On the other hand, a use prohibited by the license is a use in defiance of the monopoly reserved by the patentee, and necessarily an unlawful invasion of the rights secured to him by his patent. The license would be no defense to a suit for infringement by a use in excess of its terms. The patentee has the exclusive right of use, except in so far as he has parted with it by his license. The essence of the monopoly conferred by the grant of the letters patent is the exclusive right to use the invention or discovery described in the patent. This exclusive right of use is a true and absolute monopoly, and is granted in derogation of the common right, and this right to monopolize the use of the invention or discovery is the substantial property right conferred by law, and which the public is under obligation to respect and protect."

And again he says:

"If, then, the patentee has the exclusive right to the use of his invention or discovery, during the term of his patent, it would seem to follow that any use by another, unauthorized by the patentee, would be an infringement of his monopoly. If, therefore, he can find a purchaser for a machine subject only to certain specified uses, any violation of the privilege granted would be an infringement, for which the remedies granted patentees would be appropriate."

We must conclude, therefore, that the owner of a patent or copyright has the right to sell the thing patented or copyrighted outright, and, at the same time, retain the control over the subsequent trade therein as to the retailers to whom, and prices at which the wholesalers may resell, and as to the prices at which the retailers may resell to consumers; that this right on his part so to do grows out of the exclusive right which the statutes as to patents and copyrights confer and which such owner has by virtue alone thereof; and that this right of outright sale and retention of control which he has, he has by virtue alone of said statutes. The exclusive right in the field of selling the thing patented or copyrighted which the statutes confer, and which he has by virtue alone thereof is the right to prevent others from selling such thing. They have no right to do so unless he licenses them. He is not bound to give any greater license as to selling than he chooses. When he sells the things patented or copyrighted outright to others, therefore, he can or not, as he chooses, give a license to resell and, of course, if he chooses to give it, he can limit the license to resell as he chooses. If he sells to wholesalers,

he can limit it to reselling to such retailers as he designates and at certain prices; and the reselling of the retailers to consumers he can limit to certain prices. It is in this way that the right of the owner of a patent or copyright to retain the control of the subsequent trade in the thing patented or copyrighted at the time he sells them outright grows out of the exclusive right conferred by the statutes and which he has by virtue alone thereof. He has it by virtue alone thereof not directly, but indirectly through the exclusive right they confer. It follows from this that no other person has the right to sell any other personal property outright, and at the same time in this way retain the control over the subsequent trade in such personal property by the vendees and subvendees thereof. The owner of a secret process does not have the right to sell articles embodying said process outright, and at the same time in this way retain the control over the subsequent trade in such article by his vendees and subvendees. He can communicate the knowledge of his secret to others and limit the use that they are to make of it, and compel them to make no greater use thereof. If they make a greater use thereof, such conduct on their part is no invasion of an exclusive right on his part, but a breach of his confidence. If he sells the articles embodying the secret to others outright, he can, at the same time, retain no greater control over the subsequent trade therein by his vendees and subvendees than can the vendor of any other personal property, not a thing patented or copyrighted, who sells it outright can at the same time retain; and he cannot retain it in any other way than the owner of such other personal property can. Neither he nor the owner of such other property can sell outright, and, by a mere limiting license to resell, retain control, so that a reselling in excess of the license will be an invasion of any exclusive right on his part and liable to be proceeded against as such.

But the question I have been considering has not been so far answered. As heretofore stated, it is this: Does the right to sell the things patented or copyrighted outright, and, at the same time by a system of contracts similar to that involved herein retain control over the subsequent trade therein by his vendees and subvendees, in the particulars stated, which it is presupposed the owner of a patent or copyright has, grow out of the exclusive right which the statutes as to patents and copyrights confer; and hence, does such owner have such right by virtue alone of said statutes? It will be noticed that the question is not whether the right to retain such control in the way I have indicated—that is, by limiting the license to resell—grows out of such exclusive right or whether the patent or copyright owner has the right to retain such control in that way by virtue alone of said statutes, but it is whether the right to retain such control by a system of contracts similar to that involved herein grows out of such exclusive right, and whether the patent or copyright owner has the right to retain such control by such a system of contracts by virtue alone of said statutes. The question thus put must be answered in the negative. No right on the part of the patent or copyright owner to sell the thing patented or copyrighted outright, and at the same time retain control over the subsequent trade therein by his vendees and sub-

vendees by such a system of contracts, grows out of said exclusive right and the patent or copyright owner has no such right by virtue alone of said statutes. Such a system of contracts, nor any contract on the part of the licensee that he will not exceed his license, is necessary to enable the patent or copyright owner so to do. He is enabled so to do by limiting the licenses as heretofore indicated. The licensees are bound not to exceed the license, even though they may not have agreed so to do. They are bound so to do in such a case, because an excess of the license is an invasion of the exclusive right. It may be that in every case of a limited license, nothing else appearing, there is an implied contract on the part of the licensee that he will not exceed the license. And, of course, the licensee may, in every case, expressly contract not so to do. But, conceivably, there may be neither an express nor an implied contract—nothing more than the sale and the limited license to resell. Such would be the case if the parties should expressly agree that there was not to be any contract on the part of the licensee not to exceed the license and that the sale and limited license should cover the transaction between them. In such a case the control of the owner of the patent or copyright over the subsequent trade in the things patented or copyrighted would be as complete as it would have been had there been executory contracts on the part of the vendees and subvendees, express or implied, not to exceed the license. The sole effect of such contracts or of such a system of contracts as are involved herein applied to things patented or copyrighted is simply to afford another remedy for an excess of the license, and another forum in which it may be enforced. In the absence of such contracts or system of contracts, the sole remedy is in tort for an infringement of the patent, either at law for damages or in equity for an injunction and an accounting, and the federal courts alone have jurisdiction thereof.

Robinson on Patents, § 855, says:

"Jurisdiction on the ground of subject-matter has been vested in the federal courts over all cases arising under the patent laws. This jurisdiction is exclusive, and hence no suit arising under the patent laws, whatever may be the residence of the parties, can fall within the cognizance of any local court."

With such contracts or such a system of contracts the owner of the patent or copyright has a double remedy, either in tort for an infringement of the patent, or on contract for a breach thereof.

Robertson on Patents, § 1222, says:

"While the same persons may occupy a twofold relation toward the owner of a patent, one as his assignee or licensee within the scope of the conveyance, the other as a stranger outside the conveyance, and in the latter capacity may commit wrongful acts for which no contract suit would lie, yet when as a contracting party he has bound himself to respect the reserved rights of his grantor, his liability rests on a double basis and he may be pursued either upon his broken contract or for his tortious interference with the property of his grantor."

Of the remedy in contract, in the absence of diverse citizenship, the state courts alone have jurisdiction.

Robertson on Patents, § 865, says:

"Citizenship being the same, the state courts have sole cognizance of all actions based on contracts between the parties, whether to compel their performance, to rescind them or to award damages for their violation. Actions for breach of warranty, for fraud, for royalty or purchase money and for the nonfulfillment of other collateral contracts are also within their exclusive jurisdiction."

In the Button Fastener Case the right of the owner of the patent involved therein to control the use of his machine was not based upon the existence of any contract between the parties other than the executed contract of sale and license to use. The suit was one in tort for a contributory infringement of the patent. Judge Lurton, however, recognized the possibility of there being a contract not to exceed the licensed use in such a case, and that if there was one there would be a double remedy. He said:

"That the buyer enters into an implied agreement that he will not use the machine contrary to the terms of his license, and that there is in the agreement a provision for a reverter of the title to the structure may operate to give the patentee a remedy under the general principles of law, as for damages for a breach of contract, or for recovery of the machine. It may be that a suit for a breach of contract would not be a suit depending on the patent laws and would, therefore, be cognizable by the state courts, as intimated in Hartell v. Tilghman, 99 U. S. 547, 25 L. Ed. 357, and White v. Rankin, 144 U. S. 628, 12 Sup. Ct. 768, 36 L. Ed. 569. The remedy of complainant may be a double one; for liability may rest either upon the broken contract or for tortious use of the invention."

In each one of the four cases based upon the Button Fastener Case heretofore referred to and considered, there was an express executory contract on the part of the vendee, the jobber, not to exceed his license, but in the first three cases which were against the subvendees, the dealers, there were no such contracts on their part. The most that can be said is that there were implied executory contracts on their part to that effect. But, in each instance, the action was for an infringement of the patent, and was brought in the federal court. In the fourth case, though the action was against the vendee, the jobber, and he was under an express executory contract not to exceed the license, and the suit was by an exclusive licensee, and not by the owner of the patent, it was treated as if the action were by the patent owner to enjoin an infringement of the patent. An instance of where there was an express executory contract and the contract remedy was pursued may be found in the case of Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. That was an action for breach of a license contract, brought in the state court and carried from the highest court of the state to the Supreme Court of the United States. The National Harrow Company granted a license to E. Bement & Sons to make and sell float spring tooth harrows, their frames, and attachments under certain patents held by it. The license was contained in a license contract executed by the parties, and the terms upon which it was given were set forth in 18 different specifications. Amongst these was one to the effect that the licensee should not sell any of the patented articles made by it at a less price or on more favorable terms of payment and delivery to the purchasers than set forth in a schedule attached to the contract, and made part thereof,

and another to the effect that the licensee should pay to the licensor for each and every of the articles sold contrary to the strict terms and provisions of the license the sum of $5 in liquidated damages. The suit was to recover the liquidated damages for sales contrary to the terms and provisions of the license, to restrain the future violations of the contract, and to compel its specific performance. The defense was that the contract was a violation of the act of Congress of July 2, 1890, on the subject of trusts. At any rate, that was the only defense which presented a federal question justifying the case being carried from the state court to the Supreme Court of the United States. It was held by both courts that it was not a violation of said act, and was valid.

The sole effect, then, of the application of a system of contracts to things patented or copyrighted is, as stated, to afford another remedy for an excess of the license, which may be enforced in another forum. It does not effectuate any control over the subsequent trade in the things patented by the vendees and subvendees of the owner of the patent or copyright. That is effectuated by the sale of the patented or copyrighted things and the limited license to resell them. The presupposition that such control is thereby effectuated is untrue. Then, as to the right to put in force such a system of contracts in relation to things patented or copyrighted with such effect as it has, that does not grow out of the exclusive right which the statutes confer, and the owner of the patent or copyright does not have said right by virtue at all of said statutes. The right to sell the things patented or copyrighted, the right to license others to sell them, and the right to enter into contract with the vendee and subvendee that they shall not exceed the license are solely creatures of the common law and they arise therefrom alone. The sole creature of the statutes is a distinct property right, to wit, the exclusive right to make, use, and sell the thing patented or copyrighted; that is, to prevent others from making, using, and selling it, which may be made the subject-matter of contract. The right of contract here is limited by the statutes. As, for instance, as to the patent right. Mr. Justice Gray, in Waterman v. MacKenzie, 138 U. S. 252, 11 Sup. Ct. 334, 34 L. Ed. 923, said:

"The monopoly thus granted is one entire thing, and cannot be divided into parts except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign the grant and convey either (1) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of the exclusive right; or (3) the exclusive right under the patent within and throughout a specified part of Rev. St. U. S. § 4898 [U. S. Comp. St. 1901, p. 3387]."

But so far as the right of contract as to the thing patented or copyrighted or as to licensing others to make, use, or sell it, or as to the licensee not exceeding the license is concerned, the statutes prescribe no limit. What, then, is essential to the making of a contract as to any one of these matters, whether in fact a contract as to either has been made, the validity of any particular contract in regard thereto, and the obligations of the parties to such a contract is to be settled and determined solely and alone by the principles of the common law.

Robinson on Patents, § 1224, says:

"The reciprocal rights of assignors and assignees, of grantors and grantees, and of licensors and licensees rest upon express or implied contracts between the parties. The law no otherwise creates them than as it permits the parties to enter into the agreements out of which they spring, and it protects them on the same grounds that it enforces other obligations. The subject-matter of these contracts, being the patent privilege, or some immunity derived therefrom, the principles of patent jurisprudence form an important element in that body of law by which the contracts are interpreted, and the relations and duties of the parties are determined. Apart from this element, however, the general law of contracts furnishes the measure by which their rights are ascertained, and the method by which their wrongs may be redressed."

Inasmuch, then, as the right to apply such a system of contracts to things patented or copyrighted arises solely from the common law, and not to any extent from the statutes as to patents and copyrights, no inference whatever can be drawn from the fact that it is proper to apply the system thereto with such effect as it has, and that it has been so held, that the owner of a secret process, who cannot appeal to any statute for any right, has no right to apply it to articles made thereunder, or that it would be unlawful for him to apply it thereto.

I am therefore driven to the conclusion that the argument of defendant's counsel is not sound. It breaks down at two points. The presupposition that control over the subsequent trade in things patented or copyrighted is effectuated by such system of contracts applied thereto is incorrect. That control is not so effectuated. It is effectuated by the exclusive right and the limited license. The sole effect of the application of the system of contracts thereto is to supply a remedy on contract that may be enforced in the state courts. The other point of break-down is in the position that the right to apply such a system of contracts to things patented or copyrighted with such effect as it has arises solely from the statutes as to patents and copyrights. To no extent does it arise therefrom. It is the creature alone of the common law. Of course, it is a circumstance in favor of the lawfulness of such a system of contracts as applied to things patented or copyrighted that it does not effectuate the control, but simply provides another remedy for an excess of the limited license which effectuates the control. In view of this, it could not well be unlawful. As applied to things made under a secret process, it lacks this favoring circumstance. But it would be illogical to argue therefrom that so applied it was unlawful.

This brings us to the other argument put forward by defendant's counsel in support of the contention that the system of contracts under which he sells his medicine outright and attempts at the same time to retain the control over the subsequent trade therein is unlawful. It is that said system of contracts in so far as it attempts to retain such control contravenes the common-law rule invalidating contracts in restraint of trade. The general principle upon which this rule is based, as stated by Pollock on Contracts, p. 309, is "that a man ought not to be allowed to restrain himself from exercising any lawful craft or business at his own discretion and in his own way." It is thus stated in the quotation made by him from the opinion in Hilton v. Eskersley, 6 E. & B. 66, 74, 75:

"Prima facie, it is the privilege of a trader in a free country in all matters not contrary to law to regulate his own mode of carrying it [his trade] on according to his own discretion and choice. If the law has in any manner regulated or restrained his mode of doing this, the law must be obeyed. But no power short of the general law ought to restrain his free discretion."

The restraint, then, which the rule and the general principle upon which it is based have in view is a restraint which a man puts upon himself by contract with another, and not a restraint which another puts upon him. Another is without power to put any restraint upon himself except by force. He alone can otherwise put restraint upon himself, and that by contract. Such restraint in its initiation is put upon him by his own discretion and choice. The entering into the contract is voluntary on his part, and the law in relieving him from it relieves him from the consequences of his own free act. It is a restraint, not only as to whether he shall carry on any lawful craft or business, wholly or in part, but also as to the way or mode of carrying it on. The cases which have arisen under the rule have fallen into two well-defined classes. One class is where, as a rule at least, the contract is between two, and but one party thereto agrees to restrain himself in some particular for the benefit of the other party. Such contracts are usually termed contracts in restraint of trade. The most usual instance of cases belonging to this class is where the owner of a business sells it to another and agrees with such other not to engage in the same business anywhere or only in certain territory. Mr. Justice Holmes in Northern Securities Co. v. United States, 193 U. S. 197–404, 24 Sup. Ct. 436, 48 L. Ed. 679, defines contracts of this class as "contracts with a stranger to the contractor's business [although in some cases carrying on a similar one] which wholly or partially restrict the freedom of the contractor in carrying on the business as he otherwise would." To the same effect, he says:

"Contracts in restraint of trade, I repeat, were contracts with strangers to the contractor's business and the trade restrained was the contractor's."

The objection to a contract of this class is its tendency to harm both the contractor and the public. The way in which it may harm the contractor is in depriving him of his livelihood in whole or in part. The way in which it may harm the public is in making him a public charge, in depriving it in whole or in part of the benefit of his activity, and in furthering an attempt at monopoly. Justice Holmes, in the opinion already quoted from, said that the objection to such contracts at common law was primarily on the contractor's own account. In early times the chance of such a contract doing harm was much greater than now. Under existing conditions, in view of the abundant opportunities for one to earn a living and the abundance of capital to go into any profitable business and its eagerness to do so, the chance of such a contract doing harm in either direction is much lessened. But all contracts of this class are not invalid, because of the restraint which they put upon one party thereto. Some are invalid, and some are not. Out of the cases that have arisen involving contracts of this kind a rule has been evolved by which it may be determined whether the contract is invalid or not. The rule is

HARTMAN V. JOHN D. PARK & SONS CO. 375

if the restraint is reasonable the contract is valid; if not, it is invalid.

As said by Judge Simonton in Hulse v. Bonsack Machine Co., 65 Fed. 869, 13 C. C. A. 180, the test is "as it is put in Ammunition Co. v. Nordenfelt (1893) 1 Ch. 630, and Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464; 'Is it, in view of all the circumstances of the case, reasonable?'" In the most usual instance of such cases; that is, where the owner of a business sells it to another, and agrees with such other not to engage in the same business, what determines the reasonableness of the particular restraint involved is whether it is essential to protect the business from invasion by the contractor. If it is, it is reasonable; otherwise it is not.

Pollock on Contracts, p. 310, says:

"Public policy requires, on the one hand, that a man shall not by contract deprive himself or his labor, skill, or talent; and, on the other hand, that he shall be able to preclude himself from competing with particular persons so far as necessary to obtain the best price for his business or knowledge when he chooses to sell."

Judge Severens, in Jarvis v. Knapp, 121 Fed. 34, 58 C. C. A. 1, says:

"The underlying principle upon which the modern cases upon this subject are grounded is that, although one cannot stifle competition by a bargain having that purpose only, yet when he purchases something or acquires some right, the value of which may be affected by the subsequent conduct of the seller, the purchaser may lawfully obtain the stipulation of the seller that he will refrain from such conduct."

The principle of absolute freedom of trade which in certain instances requires that a contract imposing restraint shall give way, in such a case, enforced by the principle of absolute freedom of contract requires that it shall remain binding. But whilst this is the most usual instance of cases involving contracts where the restraint imposed is reasonable and the contract therefore valid, there are other instances of such cases which often arise.

Judge Taft, in United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122, undertakes to specify the instances of such cases. They are as follows:

"Agreements (1) by the seller of property or business not to compete with the buyer in such a way as to derogate from the value of the property or business sold; (2) by a retiring partner not to compete with the firm; (3) by a partner pending the partnership not to do anything to interfere by competition or otherwise with the business of the firm; (4) by the buyer of property not to use the same in competition with the business retained by the seller; and (5) by an assistant, servant or agent not to compete with the master or employer after the expiration of his time of service."

As to what is essential to the validity of such agreements, he says:

"Before such agreements are upheld, however, the court must find that the restraints attempted thereby are reasonably necessary (1 and 2) to the enjoyment by the buyer of the property, good will, or interest in the partnership bought; or (3) to the legitimate ends of the existing partnership; or (4) to the prevention of possible injury to the business of the seller from use by the buyer of the thing sold; or (5) to protection from danger of loss to the employer's business caused by the unjust use on the part of the employé of the confidential knowledge acquired in such business."

Then, as to whether his classification embraces all the possible instances of such cases, he said:

"It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract or to protect him from the dangers of an unjust use of those fruits by the other party."

The other class of cases which has arisen involving the restraint of trade rule is where the contract is between two or more persons engaged in the same business, sometimes including all the persons so engaged in a particular locality or everywhere; but each one engaged separately, and with no concern or interest in the business of any other one, and each one agrees to restrain himself in some particular for the mutual benefit of all. Such contracts are termed by Page, in his work on Contracts, "monopoly contracts," and in Anti-Trust Act, June 10, 1890, c. 407, 26 Stat. [U. S. Comp. St. 1901, p. 1886], "combinations or conspiracies in restraint of trade." Mr. Justice Holmes, in the opinion already quoted from, defined them as "combinations to keep strangers to the agreement out of the business." This would seem, however, not to be full enough. They include combinations to enhance prices in other ways, as by dividing territory, limiting output, fixing prices, or in any other way. Judge Taft defines them as "contracts having no purpose but to restrain competition and maintain prices." Judge Severens, in the quotation already made from his opinion in Jarvis v. Knapp, refers to them as bargains having the purpose only to stifle competition. The objection to contracts of this class, as stated by Mr. Justice Holmes, is "not an objection to their effect upon the parties making the contract, the members of the combination or firm, but an objection to their intended effect upon strangers to the firm, and their supposed consequent effect upon the public at large." Where, however, the purpose of the contract is to enhance prices otherwise than by keeping strangers out of the business the objection to it is for its direct effect upon the public at large. It is in contracts of this kind that the modern disposition to reduce competition and create monopolies has mostly manifested itself.

Page, in his work on Contracts (section 373), says that such contracts are "always illegal." And such I understand to be the drift, at least, of Judge Taft's opinion in the Addyston Pipe & Steel Co. Case.

In view, then, of this difference between these two classes of cases as to the validity of the contracts belonging to them, in the one class, the contract being valid if the restraint is reasonable; in the other class, the contract probably being invalid without any reference to the question of reasonableness, it is important to determine to which class the system of contracts involved herein belongs. If it belongs to the second class, then probably we have nothing more to do than to locate it. If it belongs to the first class, then, if the restraint is reasonable, the system of contracts is certainly valid. In any event, it will add to clearness of thought to locate it. But before attempting to do this, a suggestion of complainant's counsel

should be considered and disposed of. It is that said system of contracts is not affected by the restraint of trade rule solely because complainant's medicine to which it is applied is an article made under a secret process. They would seem to contend that no contract by the purchaser of an article made under a secret process restraining himself as to what he should do with it is within the restraint of trade rule simply because it is made under such a process. That the nature of the property sold may of itself determine that a restraining contract in relation thereto is not affected by the rule, must be conceded. A patentee may assign his patent right and enter into a contract restraining himself with reference thereto.

In the case of Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 24-43, 11 Sup. Ct. 478, 35 L. Ed. 55, Mr. Justice Gray said:

"A covenant by the assignor of letters patent for an invention that he will not himself make, use, or sell the patented article is undoubtedly valid, because the act of Congress which creates the monopoly expressly authorizes it to be assigned as a whole."

The same is true as to a grant by a patentee of his patent right, which is an assignment for a particular territory, and for the same reason. So a patentee may grant a license and enter into such a contract with reference thereto.

In the case of Vulcan Powder Co. v. Hercules Powder Co., 96 Cal. 510, 31 Pac. 581, 31 Am. St. Rep. 242, Judge McFarland said:

"As a patent is a sort of monopoly the owner may manufacture under it or not as he pleases, and may make either a partial or entire assignment of it, and may protect his assignee, not only by an agreement not to use the patent (which would be unnecessary, because such use would be an infringement), but by a covenant not to interfere in anyway with the profits to be derived from the assigned patent."

To the same effect are the following cases, to wit: Morse v. Morse, 103 Mass. 73, 4 Am. Rep. 513; Good v. Daland, 121 N. Y. 1, 24 N. E. 15; Bonsack v. Machine Co. (C. C.) 70 Fed. 383.

Likewise, in relation to the patented thing, as we have seen, the purchaser thereof may be restrained as to the use of it by him. This, however, is effected without any restraining contract on the part of the purchaser, simply by the seller, the owner of the patent, limiting the license as to what the purchaser may do therewith. Again, a restraining contract in relation to a secret process is valid simply because of the nature of the property to which it relates. The existence and value of a secret process as property depends upon the fact that its secrecy can be maintained by a restraining contract. Hence one to whom it is communicated by the owner may by contract restrain himself as to the use he is to make of it.

In the case of Harrison v. Glucose Sugar Refining Co., 116 Fed. 304, 53 C. C. A. 484, 58 L. R. A., 915, Judge Jenkins said:

"In such a case it may well be doubted if the rule with respect to restraint of trade should apply, because these secrets of business are the property of the appellee, to which the public has no right, and may not justly insist that it shall receive the benefit of the appellant's services through breach of confidence. * * * In all such cases courts have uniformly enjoined the delin-

quent party from engaging in the business from which he has agreed to refrain and from disclosing the secrets of the business which he has thus acquired."

It was on this principle that it was held by the Supreme Court in Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, that contracts of telegraph companies with the Board of Trade of Chicago, by which said companies agreed not to communicate quotations of prices for wheat, corn, and provisions offered and accepted in its exchange which they received from it, to persons who were not in contractual relations with it and approved by it, were valid. Mr. Justice Holmes said:

"But so far as these contracts limit the communication of what the plaintiff might have refrained from communicating to any one, there is no monopoly or attempt at monopoly and no contract in restraint of trade, either under the statutes or at common law."

So, likewise, the owner of a secret process in selling it to another may, by contract, restrain himself not thereafter to use it or to divulge it to others. In the case of Central Transportation Co. v. Pullman Palace Car Co., supra, Mr. Justice Gray said:

"Upon the sale of a secret process, a covenant, express or implied, that the seller will not use the process himself or communicate it to any other person, is lawful, because the process must be kept secret in order to be of any value, and the public has no interest in the question by whom it is used."

In the case of Ammunition Co. v. Nordenfeldt, 1 Ch. 630, L. J. Bowen said:

"Sales of secret processes are not within the principle or the mischief of restraint of trade at all. By the very transaction in such cases, the public gains on the one side what it lost on the other, and, unless such a bargain was treated as outside the doctrine of general restraint of trade, there could be no sale of secret processes of manufacture."

To the same effect are the cases of Vickery v. Welch, 19 Pick. (Mass.) 523; Jarvis v. Peck, 10 Paige (N. Y.) 125; Hard v. Seeley, 47 Barb. (N. Y.) 428; Alcock v. Giberton, 5 Duer. (N. Y.) 76; Tode v. Gross, 127 N. Y. 480, 28 N. E. 469, 13 L. R. A. 652, 24 Am. St. Rep. 475; Simmons Medicine Co. v. Simmons (C. C.) 81 Fed. 163; Fowle v. Parke, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67.

It is therefore true, as stated by Judge Scott, in Standard Fire Proofing Co. v. St. Louis Co., 177 Mo. 559, 76 S. W. 1008, that:

"Patented inventions and secrets of art or trade not patentable are not within the purview of the rule against restraint of trade."

But what we have to do with here is not the secret process by which complainant's medicine is made. It is the medicine itself, made under the process. The secret process and the medicine made under it are separate and distinct things, and each is a subject of ownership. One person may own one and another person the other. The question has been argued whether a sale of an article made under a secret process is a publication of the process. It is and it is not. It is, if and when one can by his own ingenuity ascertain therefrom the process by which it is made. Until he so ascertains it, there has been no

publication of the process; and in the meantime the ownership of the secret and the right to its protection is as full and complete as if no sale had ever been made of the article embodying the secret process. But still, as stated, such article is not the process and the rights with reference to each are different. What is there, then, in the nature of the articles made under a secret process to occasion any difference between them and articles not so made or between them and articles which one may not have made at all, but simply owns, in the matter of the validity of restraining contracts entered into by purchasers thereof from the owner? It is hard to conceive of any. It is true that the manufacturer and owner of the articles made under the secret process may refrain from making them and selling them to purchasers, and thus putting them upon the market. Equally so, the manufacturer and owner of any other articles may refrain from so doing. So, also, the owner of articles that he has not made, but has purchased, or otherwise obtained from the manufacturer may refrain from selling them to purchasers, and thus putting them upon the market. Suppose that the owner of a patent should sell all the articles made under it to another with license to use or resell them, thus passing them outside of the monopoly of the patent in the hands of the purchaser, would the mere fact that they had been made under the patent lend any sanctioning force to a restraining contract entered into with reference thereto by a subpurchaser thereof? I must conclude, therefore, that the fact that complainant's medicine has been made under a secret process has no effect whatever on the validity of the system of contracts involved herein. He has no greater rights in relation thereto, as distinguished from the secret process under which it was made, than the owner of any other tangible personal property, whether made by him or not, would have in relation to such property. Nor can the fact that he sells it under a trade-mark and a certain dress, which no one else has the right to use, even if he did by his own ingenuity ascertain the secret process by which it is made and thus became enabled to make and sell it, make any difference. No reason occurs to me why the owner of goods trade-marked and peculiarly dressed should have the right to obtaining a restraining agreement from the purchaser of his goods, and the owner of goods not so marked or dressed should not have such right. All goods have some dress, and if not trade-marked are marked with the name of the seller. If, then, such a system of contracts is valid, as applied to complainant's medicine, it would be equally valid as applied to any other article of tangible personal property owned by the one so applying it. The validity of that system depends entirely, therefore, upon the question as to which of the two classes of contracts involving the restraint of trade rule it belongs, and if it belongs to the first class, whether under all the circumstances it is reasonable.

To which class, then, does it belong? The only ground for claiming that it belongs to the second class is that its purpose is to maintain the prices of complainant's medicine to the retailers and consumers. There is nothing in them, beyond the uniformity of price

provided for, to affect competition amongst different wholesalers and amongst different retailers. The contracts are not between persons engaged in the same business. One set of them is between complainant, who is a manufacturer, and wholesale druggists; and the other set is between him and retail druggists. A separate contract is entered into between complainant and each wholesaler and between him and each retailer. In each contract between complainant and a wholesaler, there is a purchase of medicine by him and an agreement on his part to restrain himself as to the persons to whom and the price at which he resells. And in each contract between complainant and a retailer, there is an agreement on his part that if he is designated as a purchaser from wholesalers to restrain himself as to price at which he resells to consumers. It is true that these contracts cover the entire trade in complainant's medicine, which fact defendant's counsel emphasize, but there is here no combination between persons engaged in the same kind of business to regulate their respective businesses for their mutual benefit to the harm of strangers or the public at large. It would seem that each of the contracts in complainant's system comes within the fourth of the five subclasses into which Judge Taft divides the first class of contracts. If complainant sold his medicine to consumers as well as manufactured it, and should make a single contract with a retailer in the market where he sold by which he sold to the retailer a lot of his medicine to resell to consumers, and the retailer agreed not to resell it at less than the price at which complainant was selling it, and thus undersell and compete with him for consumers, it would present a case clearly within said fourth subclass, and the validity of the restraint which such retailer thus put upon himself would depend upon its reasonableness, that in turn depending upon whether the restraint was reasonably necessary to the prevention of possible injury to complainant from use by the retailer of the medicine sold to him. The cases cited by Judge Taft in illustration of this fourth subclass each involved a single sale and agreement. Those cases are as follows, to wit: American Strawboard Co. v. Haldeman Paper Co., 83 Fed. 619, 27 C. C. A. 634; Hitchcock v. Anthony, 83 Fed. 779, 28 C. C. A. 80; Oregon Navigation Co. v. Winsor, 20 Wall. (U. S.) 64, 22 L. Ed. 315; Dunlop v. Gregory, 10 N. Y. 241, 61 Am. Dec. 746; Hodge v. Sloan, 107 N. Y. 244, 17 N. E. 335, 1 Am. St. Rep. 816.

In the American Strawboard Co. Case, that company owned and operated a number of strawboard mills. It conveyed one of them to the Haldeman Paper Company, which agreed not to manufacture strawboard at said mill for 20 years. In the Anthony Case, Anthony was lessee of a dock upon which he conducted the business of dealing in coal and fish and conveyed another dock near by to Hitchcock, a dealer in lumber, who agreed not to engage in the coal or fish business or do anything that would conflict with the grantor's business for seven years. In the Oregon Navigation Company Case, that company was engaged in navigating the Columbia river in Oregon and Washington. It had purchased the steamer New World from the California Navigation Company, which was engaged in navigating Cali-

fornia waters, and had agreed with it not to employ said steamer in California waters. It sold the steamer to Winsor, who was engaged in navigating Puget's Sound. He agreed not to use it in California waters or Columbia river for 10 years. In the Gregory Case, Gregory who was engaged in navigating Hudson river between New York, Albany, and Troy, sold a two-thirds interest in steamboat Robert L. Stevens to Dunlop, who agreed not to use it at any time thereafter as a passage boat on Hudson river, above the village of Saugerties. In the Hodge Case, Hodge's testator, who was engaged in the business of selling sand from land he owned, conveyed a piece of the land to Sloan who agreed he would not sell any sand from it. In each case it was held that the restraining agreement was valid. Had there been in each case any number of similar sales of similar property with similar restraining agreements, each transaction would have belonged to the fourth subclass and the restraining agreement in each would have been dependent upon its reasonableness for its validity. Their numerousness would not affect their nature. It may be said, however, that complainant does not sell save to wholesalers to resell to retailers and that therefore neither the wholesalers nor retailers are possible competitors of complainant and the restraining agreements entered into by the wholesalers and retailers are not to prevent or affect their using the medicine in competition with him, and, hence, do not come within the letter of that fourth subclass, which covers agreements by the buyer of property not to use the same in competition with the business retained by the seller. This may be true. But the spirit of the subclass covers restraining agreements by the buyers of property to prevent their using it in any other way than by competition so as to injure the business of the seller. The principle involved in this subclass is that, if one in business sells property to another and such property may be used by the purchaser in a way to injure the business of the seller or to render it less profitable than it would otherwise be, a restraining agreement on the part of the purchaser as to the use of it may be reasonable under the circumstances of the case, and if so, valid.

Judge Taft, in Addyston Pipe & Steel Co. Case, in leading up to the classification which he made of the cases coming within the first class, said:

"When one in business sold property with which the buyer might set up a rival business it was certainly reasonable that the seller should be able to restrain the buyer from doing him an injury which, but for the sale, the buyer would be unable to inflict."

It would be equally reasonable that the buyer should be able to restrain himself from using the property in any other way than setting up a rival business, so as to do the seller an injury which but for the sale he would be unable to inflict. But whether or not the system of contracts involved here comes within said fourth subclass, they are certainly covered by the language used by Judge Taft to take in any possible omissions from the classification he made. In each contract the restraining agreement is ancillary or collateral to the main purpose of a lawful contract, to wit, a sale of the medicine,

and, according to complainant's claim, it is necessary to protect him from an unjust use of the legitimate fruits of the contract by the purchaser. I therefore conclude that the system of contracts involved herein belongs to the first class, and that its validity depends solely upon its reasonableness. Is it reasonable, then, that complainant should have the right to put in force the system of contracts involved herein and obtain from his vendees and subvendees restraining agreements from the vendees, as to whom and prices at which they shall resell, and from the subvendees, as to the prices at which they shall resell? A question arises here as to the party on whom lies the burden as to the reasonableness. Is it on complainant to show that the restraint in question is reasonable, or is it on defendant to show that it is unreasonable?

Judge Simonton, in Hulse v. Bonsack Machine Co., supra, says:

"This is not literally an agreement in restraint of trade. It is simply a contract which by analogy can be likened to one, and the analogy should not be pushed beyond the reason for it. There is no presumption that such a contract is void. The presumption is in favor of the competency of the parties to make the contract and the burden is upon the party who alleges that it is unreasonable or against public policy."

On the other hand, Beach on Contracts, vol. 2, § 1562, says:

"Many authorities declare in substance that all restraints are presumed to be bad, but, if the circumstances are set forth, that presumption may be excluded, and the court judges of these circumstances whether the contract be valid or not."

I do not find it essential to this case to locate the burden, as I hold that under the allegations of the bill, which are admitted by the demurrer, said system of contracts as applied to complainant's medicine is reasonable. The circumstances which lead me to this conclusion are these: That complainant's vendees and subvendees should be so restrained is advantageous to complainant's business. It would be an injury to it for them not to be so restrained. Exactly how it is so advantaged and how it would be injured by a removal of the restraint has not been developed in the argument; and I do not feel sufficiently advised as to such matters to say as to this. It would seem that the existence of such a system of contracts in relation to complainant's medicine would tend to prevent demoralization in the trade therein through competition amongst his vendees and subvendees, and enable him to maintain the prices for his medicine. But, however this may be, it is alleged in the bill that before complainant established and put said system in force the "cut rate" or "cut price" system had resulted in much confusion, trouble, and damage to complainant's business, and had injuriously affected the reputation and depleted the sale of his medicine, and that it was established and put in force to protect his trade, custom, and business, and the manufacture and sale of his medicine; that it prevents cutting of prices and demoralization of trade both wholesale and retail, greatly benefits him by increasing the sales of and demand for his medicine, and is of great value to him in his business; and that it has been of great benefit and advantage to him and his business, and has increased his

trade and business. It is further alleged that the prices which he and his vendees and subvendees get for his medicine are reasonable. These allegations must be accepted as true. The vendees and sub-vendees would not have the opportunity to sell his medicine if he did not make and sell it. He thus brings trade to them. By fixing a uniform price on his medicine on sales by himself to the whole-salers, on sales by wholesalers to retailers and by retailers to con-sumers, all purchasers, wholesalers, retailers, and consumers are treated alike, the large wholesalers have no advantage over the small ones, nor the large retailers over the small ones. All sellers and all consumers are treated alike. Complainant creates the demand for the medicine, as he alone advertises it. And, finally, complainant could accomplish the very same result by a different system, against which no legal complaint could be made. This would be by a sys-tem of agencies. Though the nature of complainant's medicine; i. e., its being an article made under a secret process, may not, without more, determine the validity of the system of contracts in question, it cannot be said that it does not add to the reasonableness of said system as applied to it. Complainant not only owns it and makes it, but no one else can make it, and if they could they could not sell it under his trade-mark and dress.

How, then, does the matter stand upon authority? The whole trend of authority is favorable to the validity of the system. The sweep-ing principle which has taken form in Judge Taft's five classes and in the general statement to cover any omissions therefrom upholds it. But there are a number of decisions more directly in point. They are as fol-lows, to wit: Elliman v. Carrington (1901) 2 Ch. 275, 84 L. T. (N. S.) 853; Garst v. Harris, 177 Mass. 72, 58 N. E. 174; Walsh v. Dwight (Sup.) 58 N. Y. Supp. 91; Park & Sons Co. v. National Wholesale Druggists, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578; Whitwell v. Tobacco Co., 125 Fed. 454, 60 C. C. A. 290, 64 L. R. A. 689.

In Elliman v. Carrington, the plaintiffs were manufacturers of Elliman's Royal Embrocation for horses and cattle and Elliman's Universal Embrocation for human beings. They sold it to the de-fendants, who bought wholesale to sell to others at retail. The latter agreed not to sell below certain prices and not to sell to others un-less they agreed not to sell below certain prices. They broke the latter part of the agreement which was the occasion of the suit. It was held that the agreement was valid. Mr. Justice Kekewich said:

"The [plaintiffs] are not bound to sell the embrocation at all; they are not bound to manufacture it. They are at liberty to do so as they please, and when they have manufactured it, they are at liberty to sell it at whatever price they choose to fix, it may be a prohibitive one or it may be such a small price that they cannot make any profit out of it. That is entirely for their consideration. There are no goods which the owner thereof may not lawfully retain or sell at such price as he pleases."

Again he says:

"Why should not Elliman's Sons & Co. be at liberty to fix the price in that way? Nobody has argued and it could not possibly be argued that they are not at liberty to fix the price in the first sale to Carrington & Son. Why

should.they not be at liberty to make the further bargain with Carrington & Son that they shall not sell it below a certain price? It is said that the contract is in restraint of trade. In one sense it is, but it is just as much and no more in restraint of trade for Elliman's Sons & Co. to say that they will not sell at all. It seems to me to say the least, that what is restraint of trade as regards Carrington & Son is really the liberty of trade as regards Elliman's Sons & Co. The cases which have been cited are well-known authorities expounding a great principle, and showing what exceptions there are to that principle. But this case seems to me not to fall within any principle or exception. I do not think that it is touched by the authorities at all. It is merely a question of whether a man is entitled.when he is selling his own goods to make a bargain as to the use to be made of them by the purchaser. It is said that.the contract is against public policy, but that phrase merely embodies for the present purpose the great principle of restraint of trade. and to say that it is to prevent Elliman's Sons & Co. from. exercising their own discretion, seems to me to be applying a well-settled principle of law to facts to which it cannot have any possible application."

It is to be noted that though the article which was sold in this case was probably made under a secret process no emphasis was laid upon the fact. The reasoning applies equally well to any article which one may own, whether he made it or not, and which he sells for purpose of resale.

In Garst v. Harris, the plaintiff sold Phenyo-Caffein, a proprietary medicine, to defendant, who agreed not. to sell it below a stipulated price, and a certain sum was agreed on as liquidated damages. The action was brought for a breach of this agreement to recover said sum. It was held that the agreement was valid.

Holmes, C. J., said:

"It is said that the contract was unlawful as in restraint of trade. * * * When, as here, there is a secret composition, which the defendant presumably would have no chance to sell at a profit at all, but for the plaintiff's permission, a limit to the license, in the form of a restriction of the price at which he may sell, is proper enough."

It is true that the fact that the article sold was a secret composition was emphasized. But the reasoning used was equally applicable to any other article; as to any other article sold the purchaser would not have had any chance to sell that particular article, however it may have been as to other articles of the same kind, at a profit at all, but by the seller's permission.

Point is made as to these two cases that in each but a single contract was involved, and not a system of contracts as here. That is true, but no doubt there was a system of contracts in each of those cases as here. A single contract; i. e., a contract with a single purchaser would hardly have been of any value to the seller. It was only by a system of contracts; i. e., a contract with every purchaser, that he could hope to accomplish anything. This must have been had in view by the court, as no point was made of the fact that there was but a single contract involved, and the reasoning was applicable to a system.

In Walsh v. Dwight, the defendants were manufacturers and sellers of saleratus and soda, articles in common use and capable of being manufactured by any one, which was known on the market as "Dwight's Cow Brand Saleratus and Soda." They sold these articles to job-

bers under contracts, whereby the latter, in consideration of a certain discount, agreed not to resell same or any other saleratus or soda at less than certain prices. The plaintiffs were rival manufacturers of saleratus and soda and the suit was to recover damages sustained by them because of defendant's system of contracts. It was assumed that plaintiffs had a right of action if the system of contracts was invalid and the disposition of the case was made to turn on its validity. It was held to be valid. Judge Ingraham said:

"It is difficult to see upon what ground it can be claimed that such a contract is illegal. That the defendants would have the right to establish agencies for the sale of their goods, or to employ others to sell them, at such prices as the defendants should designate, cannot be disputed. Nor can it be that a manufacturer of merchandise cannot agree to sell to others upon condition that the vendee, in selling at retail, should charge a specified price for the goods sold, or should sell only the manufactured product of the manufacturer. If a dealer in articles of this kind, for his own advantage, agrees to confine his business to a particular line of goods, or agrees with the manufacturer to charge a particular price for the articles which he sells in his business, such an agreement is not illegal, as in restraint of trade or as tending to create a monopoly, as there is nothing in the agreement to prevent others from engaging in the business, or the manufacturers of other articles from selling their products to any one who is willing to buy. There is nothing to prevent any individual from selling any property that he has at any price he can get for it. Nor is there any reason why an individual should not agree that he will not sell property which he owns at the time of making the agreement, or which he thereafter acquires, at less than at a fixed price; and certainly a contract of this kind is not one which exposes the parties to it to any penalty, or subjects them to any action for damages by those whose business such a contract has interfered with."

The case of John D. Park & Sons Co. v. National Wholesale Druggists Association was a suit by by the defendant herein against an association of wholesale druggists to recover damages alleged to have been occasioned by said association causing manufacturers of medicines to refuse to sell to this defendant on the same terms as it sold to members of said association unless it would enter into a contract by which it agreed not to resell same at less than certain prices, a contract similar to that which each member of said association had entered into with said manufacturers. It was held that the system of contracts was valid, and this defendant was not entitled to recover. There was a dissent by three of the judges. One dissent was based upon the ground that, though the manufacturers had a right voluntarily to put in force such a system of contracts, it was illegal for the jobbers to drive them to put in force said system by refusing to deal with them unless they did. Another dissent was based upon the ground that jobbers required the manufacturers not only to sell at the same price to each jobber, but to compel each jobber to sell to the consumers at the same price. "It is in this respect" it is said "that the agreement is vicious and operates in restraint of trade for it destroys competition among the jobbers." The force of the decision is weakened somewhat by the consideration that it is not entirely clear that the court did not think that the medicine to which the system of contracts was held lawfully applicable had been patented. The reasoning of the opinions rendered on behalf of the majority of the court, how-

145 F.—25

ever, is not based on the fact that they had been patented. It is equally pertinent to proprietary medicines. This case suggests that possibly complainant was driven to adopt its system of contracts by the organization of wholesale druggists.

In Whitwell v. Tobacco Co., the defendant was a manufacturer of tobacco and the plaintiff a jobber therein. The defendant's method of doing business was to fix the prices of its goods so high to those who did not agree to refrain from dealing in the commodities of its competitors that their purchase was unprofitable, while it reduced the prices to those who did so agree so that the purchase of the goods was profitable to them. The plaintiff applied for a purchase, but refused to so agree, and, upon his so refusing, the defendant refused to sell to him. He then brought the action to recover damages for the refusal. It was held that he could not, that such an agreement on the part of a jobber was legal, and that the defendant had a right to refuse to sell to him unless he would enter into it. Judge Sanborn said:

"The tobacco company and its employé sold its products to customers who refrained from dealing in the goods of its competitors at prices which rendered their purchases profitable. But there was no restriction upon competition here, because this act left the rivals of the tobacco company free to sell their competing commodities to all other purchasers than those who bought of the defendants, and free to compete for sales to the customers of the tobacco company by offering them goods at lower prices or on better terms than they secured from that company. The tobacco company and its employé were not required, like competitors engaged in public or quasi public service, to sell to all applicants who sought to buy, or sell to all intending purchasers at the same prices. They had the right to select their customers, to sell and to refuse to sell to whomever they chose, and to fix different prices for sales of the same commodities to different persons. In the exercise of this right they selected those persons who would refrain from handling the goods of their competitors as their customers, by selling their products to them at lower prices than they offered them to others. There was nothing in this selection, or in the means employed to effect it, that was either illegal or immoral. It had no necessary effect to directly and substantially restrict free competition in any of the products of tobacco, and it did not unlawfully restrain interstate commerce, because it in no way restricted the exercise of the rights of the competitors of the tobacco company to fix the prices of their goods and the terms of their sales of similar products according to the dictates of their respective wills."

Besides these cases there is that of Dr. Miles Medical Co. v. Goldthwaite (C. C.) 133 Fed. 784. The force of this decision, however, is weakened by the fact that there no argument was made on behalf of defendant. I have also been referred to certain unreported decisions upholding the validity of complainant's system of contracts. They are decisions by Judge Lochren in the case of Hartman v. Hughes, pending in the United States Circuit Court for the District of Minnesota, rendered July 14, 1905 (no opinion) ; by Judge Kohlsaat, in the case of Dr. Miles Medical Company v. Platt, pending in the United States Circuit Court for the Northern District of Illinois, Eastern Division, rendered 19th day of January, 1906 (142 Fed. 606) ; and by Judge Tuley, in the case of Platt v. National Association of Retail Druggists, pending in the circuit court of Cook county, Ill., rendered January 24,

1905. But in none of these cases apparently did the judges have to reckon with the line of argument that is presented here, and though reaching the same conclusion, I have proceeded along different lines. It is to be noted that this is not a case where the manufacturer undertakes to maintain retail prices for the sale of his goods by a direct restrictive agreement with the wholesaler, and by affixing labels to the goods charging all subsequent transferees with notice of the conditions under which they were originally sold. A case of that sort presents the interesting question whether in this way the manufacturer can maintain the retail prices of his goods; i. e., whether the doctrine laid down in Tulk v. Moxhay, 2 Ph. 774, by which covenants restricting the use of land are enforced against purchasers with notice should be extended to chattels.

The cases of New York Bank Note Co. v. Hamilton, etc., Co., 28 App. Div. 411, 50 N. Y. Supp. 1093; Murphy v. Christian Press, etc., Co., 38 App. Div. 426, 56 N. Y. Supp. 597, have been cited as holding that it should, and the cases of Taddy & Co. v. Stevens & Co., 20 T. L. R. 102, Eng. Ch. D.; Garst v. Hall & Lyon Co., 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631; as holding that it should not. In the case of De Mattos v. Gibson, De Gex & Jones, 276, the doctrine was applied to a steamboat. Lord Justice Knight Bruce said:

"Reason and justice seem to prescribe that, at least as a general rule, where a man by gift or purchase acquires property from another with knowledge of a previous contract, lawfully, and for a valuable consideration made by him with a third person, to use and employ the property for a particular purpose, and in a specified manner, the acquirer shall not, to the material damage of the third person, in opposition to his contract, and inconsistent with it, use the property in a manner not allowable to the giver or seller. The rule applicable alike in general, as I conceive, to movable and immovable property, recognized and adopted, as I apprehend, by the English law, may, like other general rules, be liable to exceptions arising from special circumstances; but I see at present no reason for any exception in the instance before us."

Here, however, the retailers enter into a contract directly with the complainant upon a valuable consideration, to wit, their being designated as retailers to whom the wholesalers may sell, and the question is whether they are bound by such contract. I therefore conclude that the complainant's system of contracts is valid. The position is taken in brief on behalf of defendant that the system of contracts is invalidated by the federal anti-trust act of 1890; but I understand that this position is not insisted on. I therefore make no further reference thereto.

The general demurrer is overruled. There is a special demurrer to so much of the bill as seeks an injunction restraining defendant from removing the dress from complainant's bottle and mutilating the label. It is urged that if the system of contracts is upheld and enforced the complainant will have no occasion for such relief. This does not occur to me as sufficient reason for his not obtaining it.

The special demurrer is also overruled.