### JOHN D. PARK & SONS CO. v. HARTMAN.

(Circuit Court of Appeals, Sixth Circuit. March 14, 1907.)

No. 1,581.

1. MONOPOLIES—CONTRACTS IN RESTRAINT OF TRADE—SALE OF ARTICLE MADE BY SECRET PROCESS.

The exemption from the common-law rule against monopoly and restraint of trade, and the provisions of the federal anti-trust act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), which has been extended to contracts affecting the sale and resale, the use or the price of articles made under a patent, or productions covered by a copyright, does not extend also to articles made under a secret process or medicine compounded under a private formula.

2. SAME—PROPERTY RIGHTS—SECRET PROCESS OR FORMULA.

While the owner of a patent or copyright is protected in his exclusive right by the statute which gives him a monopoly, there is no statute which protects one who makes or vends an article which is made by a secret process or private formula, nor, so long as he keeps his process secret, can he bring himself within the principle of the statute which grants a temporary monopoly in consideration of the full publication of the invention or work.

3. CONTRACTS IN RESTRAINT OF TRADE—SALE OF ARTICLES MADE BY SECRET PROCESS.

The owner of a secret process or formula is not protected by law in his secret, but he may protect himself by contract against its disclosure by one to whom it is communicated in confidence, or restrict its use by such person, and such contracts are not in restraint of trade because of the character of the property right in the secret which would be destroyed by its disclosure, and because it is not in itself an article of commerce, but such considerations do not apply to contracts for the sale of the manufactured product which do not involve a disclosure of the secret, and such contracts are within the rules against restraint of trade.

4. SAME.

The fact that an article of commerce is sold under a trade-name or in a trade dress affords it no exemption from the common-law or statutory rules against restraint of trade.

5. SAME.

The sole manufacturer of a medicine made in accordance with a secret formula, but unpatented, sold the same only under a system of contracts between himself and wholesale dealers to whom alone he sold at uniform prices, by which they bound themselves to sell at a certain price

and only to retail dealers designated by him, and between him and such retail dealers, by which in consideration of being so designated they bound themselves to sell to consumers only and at a certain price. Such contracts had been entered into as the manufacturer alleged by a large majority of the wholesale and retail druggists in the United States. *Held*, that such system of contracts was prima facie illegal both at common law as in unreasonable restraint of trade and under the federal anti-trust act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), where it affected interstate sales; its purpose and effect being to prevent competition between purchasers of the medicine both wholesale and retail, and that, in the absence of allegation of facts showing it to be necessary for the protection of the manufacturer's business, a court of equity would not aid in the enforcement of the contracts by granting an injunction to prevent a defendant, who was not a party thereto, from buying the medicine from purchasers who were, and reselling the same at any price it might see fit.

[Ed. Note.—Rights and liabilities of parties contracting with trusts or combinations in restraint of trade, see note to Chicago Wall Paper Mills v. General Paper Co., 78 C. C. A. 612.]

**6. SAME—SINGLE CONTRACT.**

A single contract, although it be such as, taken alone, may not be within the rule at common law against contracts in restraint of trade, which is one of a great number of identical contracts made between the producer of an unpatented article of commerce and dealers therein, forming a "system" of contracts, which, taken as a whole, materially affects the public interests by stifling competition and trade in said article, is an unreasonable restraint, and within the rule at common law against contracts in restraint of trade, if, from an examination of the workings of the whole system, it appears that the restraint is actually, though not ostensibly, the main result and object of the system of contracts, and not merely ancillary or incidental to another and legitimate object.

Appeal from the Circuit Court of the United States for the Eastern District of Kentucky.

For opinion below, see 145 Fed. 358.

The plaintiff below is a manufacturer of certain proprietary medicines, the chief of which is the well-known article called "Peruna." This, together with other preparations, he puts on the market through a system of contracts intended to maintain prices. Thus it is averred that he sells only to jobbers or wholesalers at uniform prices with a discount varying according to quantity. Each such jobber is required to sign a written agreement to sell only to retailers whose names shall be furnished by complainant, and who shall have signed a retailer's agreement with him obligating them to sell only to consumers at a price named by the complainant or found on his labels and wrappers. To enable him to discover violations of the agreement to sell only for consumption and only to consumers, each such retailer is required to stamp or write his name on each bottle or package sold, and, to insure against sales by wholesalers to unlicensed retailers, each sale must be reported to the complainant. The averment is that there has grown up a very large demand for "Peruna," and that such contracts have been made with jobbers and wholesalers all over the United States, and that "a majority of the retail druggists of the country have executed such contracts."

The defendant is a corporation organized under the laws of Kentucky, and is engaged in the jobbing or wholesale drug and proprietary medicine business. It is charged that the defendant company, with full knowledge of complainant's method of contracting the sales of "Peruna," has refused to enter into any contract with the complainant, and is not therefore entitled "to buy or deal in your orator's medicines and remedies." It is then averred that defendant company, in combination with other wholesalers and retailers, who have refused to sign complainant's contracts, has "unlawfully and fraudulently obtained and procured your orator's remedies and medicines, including 'Peruna,' from your orator's wholesale and retail agents, both directly and indirectly, by means of false and fraudulent representations and by surrepti-

tious and dishonest methods, and by persuading, directly or indirectly, your orator's wholesale and retail agents, under contract with your orator as aforesaid, to violate and break said contracts and sell and supply your orator's remedies and medicines, including 'Peruna,' to said defendant, and, after having procured" same, has advertised and sold same to dealers at less than the established price and less than the jobbing prices. It is also averred that, for the purpose of rendering it difficult to trace such purchases, the defendant, obliterates the serial number placed in such carton, and defaces and takes off the distinctive wrappers, etc., and in that condition sells the same. All of which conduct is averred to have resulted in "irreparable injury and damage" to complainant's system of trade, and that defendant gives out that it will continue its said conduct. The prayer of the bill is that the defendant be enjoined "from in any manner inducing or persuading, or attempting to procure, induce or persuade, directly or indirectly" any breach of any such sales agreement as stated, "and from procuring or attempting to procure in any way your orator's remedies and medicines, directly or indirectly, from any wholesaler or retailer who has executed such wholesale or retail agency contract with your orator in violation of same," and "from advertising, selling, or offering for sale the remedies and medicines of your orator obtained in or by any of the means aforesaid at prices less than the established retail price thereof, or to wholesale or retail dealers who have not entered into wholesale or retail contracts with your orator," and from mutilating or removing the cartons, wrappers, or labels upon the bottles, etc. The usual prayer for an accounting concludes the bill.

The defendant demurred for want of equity and specially to so much of the bill as sought to enjoin the defendant from mutilating labels, cartons, or wrappers, etc. The demurrers were overruled, and an injunction awarded pendente lite in the very terms of the bill.

From this interlocutory injunction this appeal has been perfected.

Alton B. Parker, William J. Shroder, and Henry T. Tay, for appellant.

Frank F. Reed, Edward S. Rogers, and Frederick W. Hinkle, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The system of contracts by means of which the complainant proposes to retain control of all sales and resales of its goods is not unique. It was first applied to commodities made under patents or productions covered by copyright. According to one of the averments of the bill, the same system of contracts has been generally adopted by the wholesale and retail druggists of the United States. But this, we take it, means no more than it has been adopted as a plan for maintaining prices and controlling sales of proprietary medicines, a business which amounts to more than $60,000,000 annually. That the same plan has been extended to sales in respect to other commodities, not coming under the peculiar claims advanced for "patent" medicines, we may take notice. The question, in its shortest form, is whether the exemption from common-law rules against monopoly and restraints of trade, and the provisions of the federal anti-trust act, which has been extended to contracts affecting the sale and resale, the use or the price of articles made under a patent or productions covered by a copyright, extend also to articles made under a secret process or medicine compounded under a private formula. The fundamental position of counsel for the complainant is that in principle there is no distinction between the monopoly secured to a patent or copyright and the monopoly of a trade secret, and they advance and defend the claim that articles made

under patents, copyrights, and trade secrets may lawfully be contracted for and sold under any conditions and limitations with respect to price and subsales which the vendor chooses to impose, and that "contracts relating to any such articles are not within the restraint of trade rules." If this contention is sound, the contracts under which the complainant conducts his business are legal, and no question remains but a consideration of the matter of the relief equity may give against one not a party to such contracts under the facts of this case.

That articles made under patents may be the subject of contracts by which their use and price in subsales may be controlled by the patentee, and that such contracts, if otherwise valid, are not within the terms of the act of Congress against restraints of interstate commerce or the rules of the common law against monopolies and restraints of trade, is now well settled. Heaton-Peninsular Button Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; Dickerson v. Tinling, 84 Fed. 192, 28 C. C. A. 139; Edison Phonograph Co. v. Kaufmann (C. C.) 105 Fed. 960; Edison Phonograph Co. v. Pike (C. C.) 116 Fed. 863; Rupp et al. v. Elliott, 131 Fed. 730, 65 C. C. A. 544; Victor Talking Machine Co. v. The Fair, 123 Fed. 428, 61 C. C. A. 58; Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. The patent grants an exclusive right to use, to make, and to sell. The patentee may grant, if he will, an unrestricted right to make and sell or use the device embodying his invention, or may grant only a restricted right in either the field of making, using, or selling. To the extent that he restricts either one of these separable rights, the article is not released from the domain of the patent, and any one who violates the restrictions imposed by the patentee, with notice, is an infringer. This is the ground upon which the cases stand which uphold restrictions upon either use or sale of a patented article where infringement is alleged. But, when a patentee imposes such restrictions, they may likewise constitute a contract between the patentee and his direct vendee or licensee. In such case the patentee would have a double remedy—an action in tort for infringement, or an action for the breach of the contract. The double remedy in such circumstances is noticed in Heaton-Peninsular Button Fastener Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728, and in Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58. In Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, the action was one for breach of a contract by which the patentee had suffered his invention to be used on condition that the articles embodying it should not be sold below a certain price. In National Phonograph Co. v. Schlegel, 128 Fed. 733, 64 C. C. A. 594, the bill was not to restrain infringement, but to enjoin sales by a vendee who was a jobber and who by direct contract had purchased phonographs made under the patent, agreeing to sell only at a named price and only to retailers who signed an agreement regulating retail sales. Whether a remedy is sought for the violation of restrictions placed by a patentee, upon either the use or the sale of an article made under the patent, is in tort or in contract, the rules of the common law in respect of monopolies and restraints of trade have no application, because the very object of

the patent law is to give to the patentee an exclusive monopoly in using, making, and selling the device which embodies the invention, and this exclusive right he may exercise by contracts under which he reserves to himself so much of his exclusive right as he does not elect to sell or assign or license. It follows therefore that contracts restraining subsequent sales or use of a patented article which would contravene the common-law rules against monopolies and restraints of trade, if made in respect of unpatented articles, are valid because of the monopoly granted by the patent. Bement v. National Harrow Co., 186 U. S. 70, 91, 93, 22 Sup. Ct. 747, 46 L. Ed. 1058; Edison Phonograph Co. v. Kaufmann (C. C.) 105 Fed. 960; Edison Phonograph Co. v. Pike (C. C.) 116 Fed. 863; Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58. In the Bement Case, cited above, the action was at law to recover liquidated damages for the breach of a contract in respect of the price at which articles made under a patent should be sold. The court, among other things, said:

"The very object of these laws is monopoly, and the rule is, with very few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal."

In regard to the provision in respect to price the court said:

"The provision in regard to the price at which the licensee would sell the article manufactured under the license was also an appropriate and reasonable condition. It tended to keep up the price of the implements manufactured and sold, but that was only recognizing the nature of the property in, and providing for its value as far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article."

It was urged in the same case that the stipulations restricting the price at which sales might be made was in violation of the act of Congress of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), upon the subject of trusts and restraints of interstate trade, but the court held that the act did not apply to contracts in relation to patented articles, saying:

"But that statute clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the licensee or assignee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act we have no doubt was never contemplated by its framers."

In National Phonograph Co. v. Schlegel, 128 Fed. 733, 64 C. C. A. 594, the same reasoning was followed and the validity of an agreement restraining prices held to be a valid contract, because it related to a patented article. There are such wide differences between the right of multiplying and vending copies of a production protected by the copyright statute and the rights secured to an inventor under the patent statutes that the cases which relate to the one subject are not altogether controlling as to the other. See Bobbs-Merrill Co. v.

Straus (C. C. A.) 147 Fed. 15, 23. Nevertheless, the statutory right to exclusively publish and vend copies of a copyrighted production would seem to take direct contracts between the publisher and his vendees in respect to the price at which subsequent sales shall be made outside of the rule as to restraints of trade which might otherwise apply. Murphy v. Christian Press Ass'n, 38 App. Div. 426, 56 N. Y. Supp. 597. But one who makes or vends an article which is made by a secret process or private formula cannot appeal to the protection of any statute creating a monopoly in his product. He has no special property in either a trade secret or a private formula. The process or the formula is valuable only so long as he keeps it secret. The public is free to discover it if it can by fair and honest means, and, when discovered, anyone has the right to use it. Chadwick v. Covell, 151 Mass. 190, 23 N. E. 1068, 6 L. R. A. 839, 21 Am. St. Rep. 442; Tabor v. Hoffman, 118 N. Y. 30, 23 N. E. 12, 16 Am. St Rep. 740; Peabody v. Norfolk, 98 Mass. 452, 96 Am. Dec. 664; Vulcan Detinning Co. v. American Contracting Co., 58 Atl. 290, 67 N. J. Eq. 243. In Chadwick v. Covell, Justice Holmes, speaking of the character of the title one has to a secret formula, said:

"Dr. Spencer had no exclusive right to the use of his formulas. His only right was to prevent anyone from obtaining or using them through a breach of trust or contract. Any one who came honestly to the knowledge of them could use them, without Dr. Spencer's permission and against his will. Peabody v. Norfolk, 98 Mass. 452, 458, 96 Am. Dec. 664; Morison v. Moat, 9 Hare, 241, 263; Williams v. Williams, 3 Meriv. 157. The defendant got his knowledge honestly, and therefore has a right to make and sell the medicines. Having the right to make and sell the medicines, the defendant has the right to signify to the public that the medicines are made according to the formulas used by Dr. Spencer."

In Tabor v. Hoffman, cited above, the New York court said:

"If a valuable medicine, not protected by patent, is put upon the market, any one may, if he can by a chemical analysis and a series of experiments, or by any other use of the medicine itself aided by his own resources only, discover the ingredients and their proportions. If he thus finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts."

But in the case of a patent the monopoly endures for the whole term of the patent. It gives the patentee the right to control the use of his invention during the entire period, and he may rightfully protect by contract his power to regulate all manufacture, sale, or use of things embodying his invention. It is this continuity of the right granted to the patentee which distinguishes it from the right to manufacture, sell, or use unpatented articles. If a man shall make a new invention or make a new discovery and it is useful; he may obtain a patent and thus secure a reward. But even then he must pursue the prescribed course in order to obtain it. He may keep his secret if he can. But, if he puts upon the market things embodying it, he forever loses his right to acquire a monopoly in it; i. e., to obtain a patent, either for manufacture, sale, or use. But it does not follow that because the owner of a secret formula cannot protect himself against discovery of his secret by fair means that he cannot protect himself against a betrayal of his secret by one who has received it through

confidential relations. Jarvis v. Knapp, 121 Fed. 34, 58 C. C. A. 1; Harrison v. Glucose Co., 116 Fed. 304, 311, 53 C. C. A. 484, 58 L. R. A. 915; Tabor v. Hoffman, 118 N. Y. 30, 23 N. E. 12, 16 Am. St. Rep. 740; Morison v. Moat, 9 Hare, 241; Chadwick v. Covell, 151 Mass. 190, 23 N. E. 1068, 6 L. R. A. 839, 21 Am. St. Rep. 442. So also will the owner of a secret process or formula be protected against a breach of contract, when the secret is communicated in confidence and under restrictions as to its use. Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67.

In Fowle v. Park, the owner of the formula sold the right to make the remedy and sell it under its trade-name at a restricted price within a given territory. The court enjoined the breach of this agreement. The conclusion of the learned Chief Justice who wrote the opinion of the court seems to rest, not upon any notion that contracts touching the sale of a secret formula or trade secret were outside the rules of the common law in regard to restraints of trade, but rather upon the theory that such contracts were governed by the principle against restraints, but valid because the covenants were made in connection with the sale of a business and not larger than necessary to protect the reserved rights of the assignor to carry on the same business. In Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 24, 53, 11 Sup. Ct. 478, 35 L. Ed. 55, Justice Gray seems to have rested the legality of such covenants upon the peculiar nature of the property which is the subject of the sale, saying:

"Upon the sale of a secret process, a covenant, express or implied, that the seller will not use the process himself or communicate it to any other person, is lawful, because the process must be kept secret in order to be of any value, and the public has no interest in the question by whom it is sold."

The most satisfactory ground upon which covenants restraining the use to be made of a trade secret may be said to not contravene the common-law rules against monopoly and restraints lies in the peculiar character of the property right which is concerned. So long as the owner of such a secret can preserve its secrecy he has necessarily a monopoly in its use, and there is no illegal restraint because he refuses to make it public. Neither is the public interest affected whether the process or formula is used by A. or B. or by both, for there can be no restraint of trade in respect of a method or formula which is known only to the discoverer and those to whom he chooses to communicate it under restrictions. Having no right to compel a publication, the public lose no right by respecting a restricted disclosure, for no freedom of traffic has been stifled. The language of Justice Holmes in Board of Trade v. Christie, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, in respect of contracts limiting the right of those who receive the market quotations to a special use, is equally applicable to trade secrets in general. The learned justice said:

"But, so far as these contracts limit the communication of what the plaintiff might have refrained from communicating to any one, there is no monopoly or attempt at monopoly and no contract in restraint of trade, either under the statutes or at common law."

In Ammunition Co. v. Nordenfeldt, L. R. 1 Ch. Div. 630, 1894, Lord Justice Bowen said that the sale of a trade secret was not with-

in the mischief of restraint of trade, because, "unless such a bargain was treated as outside the doctrine of general restraint of trade, there could be no sale of secret processes of manufacture."

The basis of the common-law protection accorded to an author is the same. His legal rights grow out of the peculiar nature of the property. His composition is properly regarded as his absolute property. He need not disclose it. But the unrestricted offer of a single copy to the public operates as a disclosure or publication, and his exclusive right to make other copies is gone. But he may in confidence exhibit his work under restrictions, and this, like the confidential disclosure of a trade secret, will not amount to a dedication to the public, and he will be protected against a violation of the conditions imposed. The whole subject of the common-law rights of an author is so fully and carefully discussed by Judge Townsend in Werckmeister v. American Lithographic Co., 134 Fed. 321, 69 C. C. A. 553, 68 L. R. A. 591, and in Bobbs-Merrill Co. v. Straus (C. C. A.) 147 Fed. 15, that it would be a work of supererogation to again go over the subject. The cases relating to the distribution of news and information rest also upon the peculiar kind of property rights involved. So long as one who by his own industry has gathered together news or information, and does not disclose it, he cannot be compelled to make publication. The matter is his own in as true a sense as a trade secret or private formula, or the composition of an author. In such circumstances it is not illegal to protect the news gatherer against the piratical use of his news and prevent a public disclosure by one who has placed himself under obligation to respect a restricted use. In such case public disclosure is destructive of its value as property. Board of Trade v. Christie, 186 U. S. 236, 250, 25 Sup. Ct. 637, 49 L. Ed. 1031; Jewelers' Mercantile Agy. v. Jewelers' Pub. Co., 84 Hun, 12, 32 N. Y. Supp. 41; Id., 155 N. Y. 251, 49 N. E. 872, 41 L. R. A. 846, 63 Am. St. Rep. 666; National Tel. News Co. v. Western Union Tel. Co., 119 Fed. 294, 56 C. C. A. 198; Exchange Tel. Co. v. Gregory, etc., Co., 1 Q. B. Div. 147 (1896); F. W. Dodge, etc., Co. v. Construction Co., 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. Rep. 412. In the Board of Trade Case, cited above, Justice Holmes, speaking of the protection granted to the business of distributing stock quotations, said:

"In the first place, apart from special objections, the plaintiff's collection of quotations is entitled to the protection of the law. It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing it, to itself. * * * The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public."

The trading stamp and railroad ticket cases, such as Sperry & Hutchinson Co. v. Mechanics' Clothing Co. (C. C.) 135 Fed. 833, and Nashville, etc., Ry. Co. v. McConnell (C. C.) 82 Fed. 65, likewise rest upon the peculiar character of the property rights involved. Neither concern the buying and selling of articles of general commerce, and both relate to things in the nature of contracts personal in character, and not to things which can ever become the subject of general trade and traffic. But it does not follow that because a secret process

or formula for a medicine or beverage will be protected against betrayal by employés or those to whom it has been communicated in confidence under a contract for a restricted use that a system of contracts for the control of all sales and subsales of the device, medicine, or beverage when once made will be outside of the rules in restraint of trade simply because the product of such secret process or formula. We have here to deal not with contracts which relate to the secret formula itself, or the right to use a trade-name or dress, as in Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67, but with the preparation when made by the owners of the process. The preparation when ready for the market and the formula are two separate and distinct things and may have distinct ownerships. Contracts in respect of a restricted use of the formula are not within the rule against restraint because of the character of the property right in such a secret. There can be no unrestricted use, before discovery by fair means, to which the owner does not consent, and then only at the expense of the destruction of its commercial value as a secret; but this is not the case with contracts which affect only traffic in the manufactured product of the secret formula. Freedom of traffic in that is consistent with its value and does not involve exposure of the formula.

Neither is there any such analogy between an article made under a patent and an article made under a secret formula as to require like exemptions from the rules which relate to articles made under neither. It is well at this point to notice that the exemption from the rule against restraint has never been extended to contracts in respect of articles made under a patent which have once passed beyond the domain of the patent by an original sale without restriction. The only reason which has ever been given for holding that a contract restricting the field of using, selling, or making of an article made under a patent is that the patent statute has granted an exclusive monopoly which cannot be cut down by the rule against restraint for that would be to grant a monopoly by law and then proceed to take it away by law.

But, if the owner of a secret process or a private formula does not or cannot bring himself under the protection of the patent statute by securing a patent upon his discovery, he cannot claim the advantage of the statute. The patent law, in consideration of a full and complete publication of the discovery or invention of the patentee, has granted to him a monopoly of his invention, including the making, selling, and using of devices embodying it, for a limited term of years. At the end of that time the disclosure made at the time he applied for his patent will enable the public to enjoy his discovery, and thus find compensation for the exclusive right temporarily conceded to the inventor. No statute grants any such monopoly to anyone who does not elect to avail himself of the benefits of the patent or copyright law. A trade secret or medical formula protects its owner only against those who acquire it under a confidential obligation to guard against disclosure, and, as we have already seen, one is free not only to use the process or formula if discovered by skill and investigation without breach of trust, but to make and sell the thing or preparation as made

by the process or formula of the original discoverer, if that be the truth. Chadwick v. Covell, 151 Mass. 190, 23 N. E. 1068, 6 L. R. A. 839, 21 Am. St. Rep. 442. To say that the owner of this secret need not make the medicine, nor sell it when made, unless it suits his convenience, is true. But the same thing may be said of the man who grows potatoes. He need not grow them, and need not sell them when grown. But, if something be conceded in favor of an article which no one can produce except the owner of the formula over one which any one can produce, what shall it be? There is no statute creating a lawful monopoly such as seems to take articles made thereunder without the rule against illegal restraint. Neither will the commercial value of the manufactured product vanish if subjected to the principles which apply to things not so made. None of the reasons which apply to patented articles, copyrighted productions, or to restricted disclosure of the secret formula itself apply to the product of the formula.

Without assenting to the claim that the making and selling of the preparation is a "publication" in the technical sense of that term, we are nevertheless unable to discover any legal or economic reason which justly exempts such articles when made from all of the rules of the common law which forbid unreasonable restraints in trade and from the anti-trust act of Congress in so far as trade in the prepared medicine is the subject of interstate commerce. Judge Cochran, who heard this case below, after considering the differences between a secret process and the article made, said:

"What is there, then, in the nature of the articles made under a secret process to occasion any difference between them and articles not so made or between them and articles which one may not have made at all, but simply owns, in the matter of the validity of restraining contracts entered into by the purchasers thereof from the owner? It is hard to conceive of any. It is true that the manufacturer and owner of the articles made under the secret process may refrain from making them and selling them to purchasers and thus putting them on the market. Equally so the manufacturer and owner of any other articles may refrain from so doing. So, also, the owner of articles that he has not made, but purchased or obtained otherwise from the manufacturer, may refrain from selling them to purchasers and thus putting them on the market. Suppose the owner of a patent should sell all the articles made under it to another with license to use or resell them, thus passing them outside of the monopoly of the patent hands of the purchaser, would the mere fact that they had been made under the patent lend any sanctioning force to a restraining contract entered into in reference thereto by a subpurchaser thereof? I must conclude, therefore, that the fact that the complainant's medicine has been made under a secret process has no effect whatever upon the validity of the system of contracts involved herein. He has no greater rights in relation thereto, as distinguished from the secret process under which it was made, than the owner of any other tangible personal property, whether made by him or not, would have in relation to such property."

Although Judge Cochran concluded that the complainant's preparations were no more exempt from the common-law rules against restraints of trade by reason of the fact that they had been prepared under secret formulas than if that had not been the case, he reached the ultimate conclusion that any vendor of an article might make similar contracts to those in suit, and that the control which was thereby secured over subsequent sales was not an unreasonable restraint

of trade. Most of the cases which he cites in support of his conclusion are in conflict with the grounds upon which he rests his decision, and, indeed, the learned counsel for the Hartman Company have not assented to so much of Judge Cochran's opinion as holds that a trade secret remedy stands in no better plight than it would if the preparation had been disclosed upon the label. And so it has come about that. the cases which have directly involved the Hartman system of contracts, and. which are relied upon by counsel to sustain their legality, all stand upon the assumption that an article made under a secret formula may be the subject of contracts maintaining prices and controlling subsequent sales to as full an extent as an article made under a patent or a production secured by a copyright. The cases directly in point are all nisi prius decisions, except Jayne v. Loder, 149 Fed. 21, decided by the Circuit Court of Appeals, Third Circuit, and are all quite .recent. They include three cases in which the Dr. Miles Medical Company was the plaintiff, namely, Dr. Miles Medical Company v. Goldthwaite (C. C.) 133 Fed. 794. The force of this case is weakened because the decree was not resisted. The next is Dr. Miles Medical Co. v. Jaynes Drug Co., 149 Fed. 838, decided by the same judge who decided the Goldthwaite Case. The next is Dr. Miles Medical Co. v. Platt (C. C.) 142 Fed. 606. This was followed by Wells & Richardson v. Abraham (C. C.) 146 Fed. 190, in which the legality of the contracts was not denied, thus lessening the value of the opinion as an authority. The ground upon which the two contested cases cited above was rested was the identity between the rights of a patentee and the owner of a mere trade secret or private formula with respect to the product or manufactured article. Thus, in Dr. Miles Medical Co. v. Jaynes, cited above, Judge Colt said:

"The contention of the defendants is that these contracts are unlawful because they are in restraint of trade. In support of this they do not rely so much upon the common-law rule as upon the federal statute (26 Stat. 209). The bill alleges that the complainant is the exclusive owner of these secret formulas, and the exclusive manufacturer of these remedies. It follows that, until voluntary disclosure or lawful discovery, the complainant has an exclusive property in these trade secrets and has the exclusive right to make and use and vend the articles made thereunder. The exclusive right of property in a trade secret is of necessity a monopoly, the same as a patent or a copyright. The complainant may make these articles, or refrain from making them. It may sell them, or refrain from selling them. It may sell them to one person, and not to another, and at such prices and upon such conditions as it may deem most advantageous. Contracts like those set out in the bill concerning articles made under trade secrets, the same as similar contracts concerning articles made under a patent or copyright, are outside the rule of restraint of trade whether at common law or under the federal statute. Hartman v. Park (C. C.) 145 Fed. .358; Dr. Miles Medical Co. v. Platt (C. C.) 142 Fed. 606; Wells & Richardson Co. v. Abraham (C. C.) 146 Fed. 190; Dr. Miles Medical Co. v. Goldthwaite (C. C.) 133 Fed. 794; Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; Board of Trade v. Christie, 198 U. S. 236, 252, 25 Sup. Ct. 637, 49 L. Ed. 1031; Garst v. Harris, 177 Mass. 72, 74, 58 N. E. 174; Fowle v. Park, 131 U. S. 88, 97, 9 Sup. Ct. 658, 33 L. Ed. 67; Park & Sons Co. v. National Wholesale Druggists' Association, ·175 N. Y. 1,· 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578; Standard Fireproofing Company v. St. Louis Company, 177 Mo. 559, 76 S. W. 1008; Victor Company v. The Fair, 123 Fed. 424, 61 C. C. A. 58; Heaton-Peninsula Company v. Eureka Company (C. C.) 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728;

Central Shade Company v. Cushman, 143 Mass. 353, 9 N. E. 629; Good v. Daland, 121 N. Y. 1, 24 N. E. 15."

In Dr. Miles Medical Co. v. Platt (C. C.) 142 Fed. 606, 610, Judge Kohlsaat says:

"These suits are brought for an infringement or violation of the property right of the complainants in the secret process owned or controlled by them. The right of a patentee, owner of a copyright, or owner of a secret process is merely the right of exclusion or debarment. The holder of such a property right, as said by the court in the Victor Talking Machine Case, cited above, is a czar in his own domain. He may sell or not, as he chooses. He may fix such prices as he pleases. He may sell at one price to one person, and another to another person. He is not required to give reasons or deal fairly with purchasers. Why is it material, then, in a suit to prevent infringement of complainants' rights in their secret processes, to inquire whether complainants have entered into a combination or conspiracy to control the very thing they are lawfully entitled to control?"

Jayne v. Loder, cited above, was decided by the Third Circuit Court of Appeals. It was an action under the seventh section of the antitrust act against a combination of three distinct national associations, one that of the wholesale druggists, another that of the retail druggists, and the Association of Manufacturers of Proprietary Medicines. The object of the combination was to exclude every dealer from trading in proprietary medicines at all who would not consent to sell to members of the combine only and at prices named by it. Arguendo Judge Archbald did say that an individual proprietor might enforce his own terms in respect to his own goods. But this was not involved. The combination was in the teeth of the law whether an individual proprietor could or could not enforce such a system as that there involved.

If we are right in our conclusion that the manufactured product of a trade secret or private formula is not immune from the common-law rules forbidding monopolies and unreasonable restraints in trade, the cases above referred to must be disapproved, at least in so far as they are grounded upon the cases which deal with articles made under patents or copyrights. In addition to the cases cited above, counsel for the appellees cite and rely upon Park v. National Wholesale Druggists' Ass'n, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578. That case involved the validity of a method of doing business and a system of contracts between manufacturers of proprietary medicines and wholesale druggists dealing in such medicines for the purpose of suppressing competition in prices. The opinion does not support the validity of such a system of contracts with reference to medicines not protected by any patent, for the decision is bottomed upon the assumption that the "proprietary medicines," the subject of the contracts then involved, were made under patents. Judge Haight, who delivered the opinion of the court, said:

"The matter in controversy has reference to the sale by manufacturers of those particular medicines or remedies covered by trade-marks, copyrights, or patents which secure to the manufacturer or proprietor the exclusive right to manufacture and sell the same. These medicines are known as 'proprietary goods,' and their manufacture and sale are confessedly under the control and management of the owner or manufacturer, who may fix his own price and adopt such plan for the sale thereof as he, in his judgment, may determine."

To the objection that the contracts were in restraint of trade, he said:

"Nor does the plan appear to me to be in restraint of trade. It is true that it does away with the competition among dealers as to prices, but it creates no restriction upon them as to the quantities that they may be able to sell or the territory within which they may confine their transactions; but upon the question of prices we must bear in mind that the goods are covered by patent rights and trade-marks, which give the proprietors the exclusive right of specifying prices at which the articles shall be sold, and, following this, the right also to require dealers to maintain the prices specified."

The principle upon which Park & Sons Co. v. National Wholesale Druggists' Association was decided is emphasized in the subsequent case of Straus v. American Publishers' Assn, 177 N. Y. 473, 477, 69 N. E. 1107, 64 L. R. A. 701, 101 Am. St. Rep. 819, where was involved the validity of an agreement between publishers of copyrighted books to regulate the price at which retail dealers should sell such books. If the agreement had stopped there, the New York court thought the agreement valid and not in unlawful restraint of trade under the principles announced in Bement v. National Harrow Company, 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, an opinion to which we have heretofore referred, which involved contracts for controlling prices of articles made under patents. After referring to the Bement Case Judge Parker, who had written a concurring opinion in the previous case, after setting out the reasoning of Justice Peckham in the Bement Case, said:

"That reasoning is employed as to patent rights. It is equally applicable to copyrights, the protection of which was perhaps the leading object of the association and agreement attacked in this action. And it points to the principle underlying the decision in the Park & Sons Co. Case, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578, upon which defendants apparently rest their claim that the judgment of the Appellate Division should be reversed. But there is a feature in this case not to be found in that one, and which requires a different judgment than the one rendered therein, which will now be pointed out."

The dissenting opinion of Judge Martin, in case of Park & Sons Company, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578, also proceeds upon the assumption that the subject-matter of the agreement concerned medicines made under patents. See page 42 of 175 N. Y., on page 140, of 67 N. E. (62 L. R. A. 632, 96 Am. St. Rep. 578). The vice which the New York court found in the Straus Case was, not that the agreement obliged publishers not to sell copyrighted books to dealers who would not maintain the retail price dictated by the publishers, but that they also refused to sell uncopyrighted books to all such dealers as did not maintain prices on copyrighted books. This the court found under the facts of the case would operate practically to exclude all persons from the business of selling uncopyrighted books who would not become parties to the agreement to maintain the price of copyrighted books, and tended to create a monopoly of sale of books not copyrighted. Touching this, the court said:

"While the leading object of this association and agreement purports to be to secure to the owner and publisher of copyrighted books that protec-

tion which the Federal government permits them to enjoy for the reasons stated by Chief Justice Marshall (supra), it does not stop there. It also affects the right of a dealer to sell books not copyrighted at the price he chooses, or to sell at all if he fails to comply with the rules of the association. A combination creating a monopoly of the sale of books not protected by copyright offends against the law of this state as much as if it related to bluestone [Union Bluestone Co. Case, 164 N. Y. 401, 58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655] or envelopes [Berlin & Jones Envelope Co. Case, 166 N. Y. 292, 59 N. E. 906], and according to this complaint, which must be accepted as true on this review, such an outcome is not only possible but probable. But it is not of moment whether such a result is probable or not; for the test to be applied is: What may be done under the agreement? Reference to the complaint makes it clear that the association has undertaken to provide for the practical exclusion from the business of selling books not protected by copyright all who refuse to be bound by the rules of the association."

That decision puts the New York court squarely in opposition to agreements, combinations, and "systems of contracts" between a manufacturer of unpatented or uncopyrighted articles and his vendees which tend to an unreasonable restraint of trade or to create a monopoly, and makes plain the ground upon which such contracts had been maintained in the Park & Sons Co. Case. That the "proprietary medicines," called more than once "patent medicines," were not in fact patented, is of no significance, if true, for the court assumed they were, and it does not appear from anything in any of the opinions that the fact assumed was not true. That opinion, by its own language, as well as by the pointed reference to the principle upon which it rested in the later opinion of the same court, has no application when, as here, the subject of the contracts in question is unpatented and uncopyrighted articles. The cases of Elliman & Sons v. Carrington & Son, L. R. 1901, 2 Ch. Div. 275, and Garst v. Harris, 177 Mass. 72, 58 N. E. 174, are also cited as supporting the legality of such a series of agreements as that under which complainant conducts his business. Both cases involved contracts of sale of article, presumably made under secret formulas, though no stress is laid upon the fact in the Elliman Case. Each was a suit directly between the vendor and his vendee. Each involved only a single transaction by which the article was sold upon an agreement that the purchaser would not resell at less than a named price. Neither concerned any other rights than those of the contracting parties, and neither decides more than that an agreement of sale of a chattel by which the purchaser agrees that he will not sell below a certain price is valid and not such a restraint of trade as to be obnoxious to the law. Neither case holds that a buyer from such a vendee, even with notice, would not get title or come under the obligation of the contract between the original parties. The most that can be made of the decisions is that, having regard to the subject-matter and the limited character of each agreement, neither contract had that sweep and extent which would constitute the restraint an unreasonable one, and therefore not within the mischief of the rule against restraints. The Elliman Case was decided by a single judge.

Walsh v. Dwight (Sup.) 58 N. Y. Supp. 91, another case relied upon to support the decree, was an action by a maker and dealer in salaratus and soda, alleged to be an article in common use, against another maker who sold another brand which he called "Dwight's

Cow Brand Saleratus and Soda," for damages to him through a course of business by which his brand of the same article lost much demand. The defendant did this, first, by extensive advertising; second, by giving to all dealers a rebate who would agree to sell its article at a minimum price named and to charge a like price for every other brand. The price thus fixed was, as averred, an extravagant price and operated to enlarge the demand for the defendant's advertised brand and diminish that for the plaintiff's. The court found no illegal restraint of trade, as there was "nothing to prevent others from engaging in the business or the manufacturers of other articles from selling their products to anyone willing to buy." The substance of the decision is well stated in the syllabus as follows:

"An agreement by a manufacturer with his customers to give them a rebate if they should refuse to sell his article, or other similar articles, at less than a certain price, is not in restraint of trade."

The fact that "Peruna" is a trade-name, that it is put on the market in a distinctive trade dress, has no bearing upon the question. The defendants are not charged with infringing the trade-mark or trade dress. The medicine they bought was the medicine put up by the complainant, and the defendants have neither sold nor offered to sell a preparation of their own for and as the preparation of the complainant. A trade-mark, or a trade-name, or trade dress, have no other effect than to prevent one from "palming" off his goods for those of another. Garst v. Hall & Lyon Co., 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. The averments of the bill as to the complainant's trade-name and trade dress are irrelevant, for no exemption from the principles of the common law is secured by either. Garst v. Hall & Lyon Co., 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. The transactions described in the bill plainly constitute sales of complainant's medicines and the general title passes to every such purchaser and subpurchaser. Garst v. Hall & Lyon Co., 179 Mass. 588, 590, 61 N. E. 219, 55 L. R. A. 631. To call such a purchaser an "agent" is to juggle with words. "Sale" is a word of precise legal import, and every wholesaler who orders goods under one of complainant's uniform contracts becomes a buyer, obtains the title, and may convey the title to another. The case must therefore turn upon the legality of the restrictions imposed by the complainant in sales which pass the general property in chattels, as well as the possession, and provide for no reverter.

Neither is the suit based upon any breach of contract by the defendants. Confessedly, they have made no contract with complainants, and have definitely refused to conform to complainant's methods of doing business. That they have bought "Peruna" on the market from sellers who had it for sale is true. That the bill avers that they bought without being licensed to buy is true. That they bought from vendors who knew this fact and who thereby breached their agreement not to sell to dealers who had not been certified to them as licensed buyers who had entered into an agreement with the complainant restricting resales is also averred. That Park & Sons Company knew

complainant's plan of business, and that in selling to them every such vendor thereby breached his agreement, is also charged, and, for the purpose of the demurrer, admitted. What is the result? Did the defendants by so purchasing, with knowledge of the restrictions imposed upon sales, thereby enter into contractual relations with complainant? Manifestly not. Did they obtain the absolute title, notwithstanding their knowledge that the sale was in breach of restrictions imposed upon the seller? Undoubtedly. The restrictions imposed by complainant upon sales and resales, if valid at all, are only so because they constitute personal contracts upon which an action will lie only against the contracting party. Garst v. Hall & Lyon Co., 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631. A prime objection to the enforcibility of such a system of restraint upon sales and prices is that they offend against the ordinary and usual freedom of traffic in chattels or articles which pass by mere delivery.

The right of alienation is one of the essential incidents of a right of general property in movables, and restraints upon alienation have been generally regarded as obnoxious to public policy, which is best subserved by great freedom of traffic in such things as pass from hand to hand. General restraint in the alienation of articles, things, chattels, except when a very special kind of property is involved, such as a slave or an heirloom, have been generally held void. "If a man," says Lord Coke, in Coke on Littleton, § 360, "be possessed of a horse or any other chattel real or personal, and give his whole interest or property therein, upon condition that the donee or vendee shall not alien the same, the same is void, because his whole interest and property is out of him so as he hath no possibility of reverter; and it is against trade and traffic and bargaining and contracting between man and man." It is also a general rule of the common law that a contract restricting the use or controlling subsales cannot be annexed to a chattel so as to follow the article and obligate the subpurchaser by operation of notice. A covenant which may be valid and run with land will not run with or attach itself to a mere chattel. Spencer's Case, 3 Resolution, 5 Coke, 16; Wald's Pollock on Contracts (3d Ed.) 278; Splidt v. Bowles, 10 East, 279, 282; Smith v. Williams, 117 Ga. 782, 45 S. E. 394, 97 Am. St. Rep. 220; Prater v. Campbell, 110 Ky. 23, 60 S. W. 918; Appollinaris Co. v. Scherer (C. C.) 27 Fed. 18, 21; Garst v. Hall & Lyon Co., 179 Mass. 588, 691, 61 N. E. 219, 55 L. R. A. 631; Taddy Co. v. Sterions Co., 73 Law Journal, 1904, Ch. Div. p. 191; De Mattos v. Gibson, 4 De. J. & Jones, 276, 282. Against this conclusion, and in supposed opposition to the above authorities, counsel for the appellee have cited the line of cases heretofore referred to relating to contracts restraining the use or sale of articles made under patents or copyrights. We have already indicated herein that these cases do not apply to contracts which do not relate to articles not made under patents or copyrights. They also cite New York Bank Note Co. v. Hamilton Bank Note Co., 180 N. Y. 280, 294–295, 73 N. E. 48, De Mattox v. Gibson, 4 De J. & Jones, 276, and Whitwell v. Tobacco Co., 125 Fed. 454, 60 C. C. A. 290, 64 L. R. A. 689. The New York Bank Note Company Case concerned the legality of a contract for the sale of "Kidder

Printing Presses" with attachments enabling them to do a certain class of work. There were patents upon certain parts of the press, but none upon the attachments. It was contended that a covenant which restricted the sales of the press with the attachments was void as in restraint of trade. The fourth syllabus is in these words:

"The fact that the contract restricted the sale of presses except to the printing company, and that a separate consideration was paid for the covenant of restriction, does not render the contract so unreasonable in its restraint of trade that it is void for that reason, where the adoption of the press to the special use was the work of both parties and the covenant not to sell other presses for similar work accompanied the manufacture and sale of a press, and constituted an integral part of the thing sold."

The ground is better shown by the following extract from the opinion itself:

"So far as the machine was the subject of patent its use was lawfully a monopoly, and therefore no contract relating to it could be condemned as creating a monopoly. But, whatever may have been the case as to the patentable character of the machine, we think the fact that its adaption to the special use was the joint work of both parties, and that the covenant not to sell other presses for similar work accompanied the manufacture and sale of a machine, rendered that covenant reasonable as constituting an integral part of the value of the thing sold."

See Tode v. Gross, 127 N. Y. 480, 28 N. E. 469, 13 L. R. A. 652, 24 Am. St. Rep. 475. It is manifest that the case is not in point. De Mattox v. Gibson is still less an authority.

Under a bill for specific performance of a charter party the question arose as to whether a mortgagee of the chartered vessel should be allowed to foreclose and thereby intercept a voyage which the vessel was under contract to make when the mortgage was given, of which contract the mortgagee had notice. It was in respect of such facts that Justice Bruce used the language which is supposed to support the notion that a covenant may attach to chattels which pass by delivery from hand to hand and bring any one who buys with notice under the restrictions against a resale at less than a dictated price. But even in that case it was said that the mortgagee who took his mortgage with notice incurred no liability in respect to the charter party, and was only obliged to desist from doing anything which would prevent performance. Whitwell v. Tobacco Co. involved nothing more than whether a tobacco manufacturer might sell his goods at one price to those who would agree to buy only from him and at a higher price to those who would not.

The conclusion we reach upon all the foregoing considerations is that the complainant cannot obtain the active interposition of a court of equity against one who is under no contract relation to him, unless the covenants which he has imposed upon his vendee and subvendees are only such reasonable and partial restraints, for his own protection, as may be legally exacted by one who sells a business or property. This court in United States v. Addyston Pipe Co. et al., 85 Fed. 271, 281, 29 C. C. A. 141, 46 L. R. A. 122 et seq., speaking by Judge Taft, laid down as an indispensable condition that "no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and neces-

sary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party." Covenants in partial restraint, and ancillary to a principal contract, which had generally been upheld, the learned judge divided into five principal classes. The fourth of these classes he defined as covenants "by the buyer of property not to use the same in competition with the business retained by the seller." As typical cases under this class, he cited American Strawboard Co. v. Haldeman Paper Co., 83 Fed. 619, 27 C. C. A. 634, and Hitchcock v. Anthony, 83 Fed. 779, 28 C. C. A. 80, both being decisions by this court. Navigation Co. v. Winsor, 20 Wall. (U. S.) 64, 22 L. Ed. 315; Dunlop v. Gregory, 10 N. Y. 241, 61 Am. Dec. 746; Hodge v. Sloan, 107 N. Y. 244, 17 N. E. 335, 1 Am. St. Rep. 816. The court below located the contracts here involved as coming under the fourth class, being covenants ancillary to the sale of the medicines put up by the complainant, which he concluded were not unreasonable for the protection of the retained business of the covenantee. Assuming that these contracts operate only as a partial and not a general restraint, a question which we do not concede, and that they are properly to be considered as covenants ancillary to a principal contract, are the restraints thereby imposed necessary to protect the complainant in his retained business, or to protect him from an unjust use of the articles by the purchaser? In the first place, we are to consider that we are not here dealing with a single contract. The complainant has made a multitude of them in identical terms, and the opposite parties comprehend, according to his bill, a large majority of the wholesale and retail druggists in the United States. The reasons which might uphold covenants restricting the liberty of a single buyer might prove quite inadequate when there are a multitude of identical agreements. The single covenant might in no way affect the public interest, when a large number might. So, also, the question as to whether the restraint was necessary to the retained business, and therefore ancillary to the principal purpose of the agreement, or whether the restraining covenants were not the principal rather than the ancillary matter, would largely depend upon the general sweep and result of a multiplication of identical contracts. The general purpose of each separate contract is the regulation of the prices and sales of the line of preparations made by complainant. A common purpose unites each covenantee to every other and the "system" is to be construed as "one piece," in which the complainant and every assenting dealer, whether wholesaler or retailer, is a party, and the agreement of each such covenantee to sell only at the prices dictated by the manufacturer constitutes one general scheme. The question here is therefore one of a totally different character from that which would arise if the question was the more simple one presented by a breach by a single covenantee. In Continental Wall Paper Co. v. Voight & Sons Co. (C. C. A.) 148 Fed. 939, where was involved a combination in restraint of trade, and, where each wholesaler and retailer in the business had executed separate but identical contracts with the corporation representing the combined manufacturers, we held that each such separate covenantee was a party to the general scheme for enhancing

prices. This was rested upon the holding that the several agreements constituted one whole. See, also, observations of Judge Taft in United States v. Addyston Pipe Co., 85 Fed. 275, 29 C. C. A. 141, 46 L. R. A. 122, and of Justice Peckham in Montague v. Lowry, 193 U. S. 38, 45, 46, 24 Sup. Ct. 307, 48 L. Ed. 608.

The plain effect of the "system of contracts," the purposed relation of each to every other being confessed by the very description of the method of carrying on business stated in the bill, is, first, to destroy all competition between jobbers or wholesale dealers in selling complainant's preparations. Complainant restrains himself by agreeing to sell at only one price and to only such persons as will sign one of his system of contracts. The contracting wholesalers or jobbers covenant that they will sell to no one who does not come with complainant's license to buy, and that they will not sell below a minimum price dictated by complainant. Next, all competition between retailers is destroyed, for each such retailer can obtain his supply only by signing one of the uniform contracts prepared for retailers, whereby he covenants not to sell to any one who proposes to sell again unless the buyer is authorized in writing by the complainant, and not to sell at less than a standard price named in the agreement. Thus all room for competition between retailers, who supply the public, is made impossible. If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant, it is not discoverable. Thus a combination between the manufacturer, the wholesalers, and the retailers to maintain prices and stifle competition has been brought about. It is true that the complainant is not in a combination with other makers of "Peruna." There are no others. If there were, there would not be a complete or general restraint; for it might then happen that these others, not being bound by any covenants, could supply the public. If the supply to come from them was adequate for the public demand, the public might be in no wise affected. Now, if the complainant had absorbed all the sources from which the demand for lumber, or furniture, or stoves could be supplied and then should say, "I will sell only to those who will resell only to those I shall license to buy and only at the price I dictate," could any voice be raised to say that the covenants, which every dealer should sign in order to prevent exclusion from trade in such articles, would be upheld by the courts and a remedy by injunction granted to restrain breaches? But it is said that a distinction exists between contracts which relate to articles which any one can make and sell and those which are made under a secret process, and that covenants in respect to the former might affect the public interest, while the public would not be affected by like covenants relating to the latter class of subjects. But, unless we are willing to say that that fact places such products wholly outside of the mischief incident to restraints of trade and upon a plane of equality in that respect with that occupied by things made under the statutory monopoly of a patent, the fact can be of no weight except as it may be a factor in determining whether the covenants exacted of jobbers and retailers, alike regulating subsequent sales and selecting subsequent buyers, are

no more than necessary to afford a fair protection to the business of the complainant and not so large as to interfere with the interests of the public. There can be no hard and fast rule by which the result can be reached in such cases. At last the question must come to this: "What is a reasonable restraint with reference to a particular case?" This was the test applied in Horner v. Graves, 7 Bing. 735, and in Nordenfeldt v. Maxim Nordenfeldt Co., 1894, App. Cases, 535,567, and also approved by this court in the Addyston Pipe Co. Case, 85 Fed. 271, 282, 29 C. C. A. 141, 46 L. R. A. 122. A general system of contracts, such as that which the complainant seeks to enforce and which the bill avers is a method generally adopted in his line of business, involves very different questions from those which arise when a single contract only is involved and when the action is between the contracting parties for a breach, as was the case in Garst v. Harris, 177 Mass. 72, 58 N. E. 174, and Elliman v. Carrington, L. R. 1901, 2 Ch. Div. 275.

Now, in what way is only a fair protection afforded the interests of complainant by stifling all competition between the jobbers of the United States who deal in complainant's preparations? In what way are the covenants which forbid them to resell to any one who will buy "necessary," to use Judge Taft's phrase, "to protect the covenantee in the enjoyment of the legitimate fruits of the contract or to protect him from the dangers of an unjust use of those fruits by the other party"? In what way are covenants which compel retailers to maintain prices, to quote Chief Justice Tindal, "such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public"? Horner v. Graves, 7 Bing. 735. The learned trial judge found it difficult to answer these questions. He says in his opinion (145 Fed. 358):

"That complainant's vendees and subvendees should be so restrained is advantageous to complainant's business. It would be an injury to it for them not to be so restrained. Exactly how it is so advantageous and how it would be injured by a removal of the restraint has not been developed in the argument; and I do not feel sufficiently advised of such matters to say as to this. It would seem that the existence of such a system of contracts in relation to complainant's medicine would tend to prevent demoralization in the trade therein through competition amongst its vendees and subvendees and enable him to maintain his prices for his medicine."

The averments of the bill are very general. Thus it is averred that:

"Some time since the class of stores known as 'department stores' and 'cut rate stores' have inaugurated a system of obtaining from cut rate wholesale and jobbing druggists and elsewhere, and offering for sale your orator's medicines, remedies, and preparations at retail prices lower than the prices fixed by your orator and stamped upon the cartons and packages. Said system is known as the 'cut rate' or 'cut price' system and resulted in much confusion, trouble, and damage to your orator's business, and has injuriously affected the reputation and depleted the sale of your orator's remedies, medicines, and preparations. Thereupon, and in order to protect its trade, custom, and business, and the manufacture and sale of his remedies, medicines, and preparations, your orator has established and put in force the following methods and system of governing, regulating, and controlling the sale and marketing of your orator's said medicines, remedies, and preparations."

Then, after setting out the system of contracts, which is now sought to be enforced, it is said:

"The entire purpose and object of the said system of contracts, serial numbers, lists, and cards being to prevent the cutting of prices and the demoralization of trade, both wholesale and retail in your orator's medicines and remedies, and the injury and damage resulting to your orator's aforesaid trade and business in the manufacture and sale of said remedies and medicines, as aforesaid, which said system and method your orator charges both in its form and purposes, and the prices therein fixed are reasonable, regular and proper, and which, if observed, will accomplish the aforesaid purposes and greatly benefit your orator in his aforesaid business by increasing the sales of and demands for his remedies, medicines, and preparations."

"These allegations," said the court below, "must be taken as true," and upon these he held that the complainants were advantaged by the covenants and injured if not so restrained. In this conclusion we cannot concur. Prima facie the contracts are plainly in restraint of trade. It was for the complainant to show that the covenants were not larger than necessary for his protection against an unjust use to the injury of complainant's retained business. Unless he could do this, he could not ask equitable relief under such covenants. This the bill does not do, unless the court is to be content with general averments that the competition methods called derisively the "cut rate" or "cut price" system had "demoralized," "confused," "troubled," and "damaged" the complainant's business. So, also, it is averred that the "system" had and will accomplish the suppression of the competition plan "and greatly benefit your orator in his business by increasing the sales of and demand for his remedies." Doubtless the "system" rigidly enforced will put an end to the "demoralization," the "trouble," and "confusion" incident to competition. But such an averment as this can be of no legal consequence, for it is no more than to say that a noncompetitive system of conducting trade and traffic in the line of articles made by complainant is of more advantage than the ordinary competitive system. That the suppression of even unreasonable competition will sanctify an agreement or combination to restrain trade will not be claimed. The whole economic system which has made our civilization is founded upon the theory that competition is desirable, and the common-law rules against restraints of trade rest upon that foundation. A partial restraint of competition may be upheld when one sells a business or other property, provided it is no greater than necessary to enable the vendor to realize the value of his good will or to secure to the buyer the enjoyment of his purchase, or to prevent the use of the property to the prejudice of the seller. But here the only competition which the contracts in question tend to suppress is competition between those who buy his goods to sell again. How the suppression of competition between his vendees and subvendees is to secure to him the enjoyment of the legitimate fruits of his contracts of sale, to which the restrictive covenants are supposed to be ancillary, or to protect him against an unjust competition, is not clear, and the bill states no facts from which we can determine whether these covenants are necessary and reasonable. The general averment that under the "cut rate" plan of doing business, demoralization and damage resulted, while under the "contract system" enlarged sales and increased emoluments have and will follow, does not answer the question as to why such covenants are necessary to protect complainant against con-

sequences which may fairly require protection. Looking to the averments of the bill as a whole and to the scheme of business as disclosed by the contracts themselves, we cannot escape the conclusion that the covenants restricting sales and resales have as their prime object the suppression of competition between those who buy to sell again. Any benefit to the retained business to result from them is manifestly but an incident of the main purpose, which is to benefit his vendees and subvendees by breaking down their competition with each other. Restraints which might be upheld if ancillary to some principal contract cannot be enforced if, when unmasked, they appear to be the main purpose of the contract and not subordinate. The covenants in the contracts signed by the retailers are not even collateral to any sales by the complainant, but to sales made by the wholesalers. Although they run to the complaint, their prime purpose is neither the protection of the retained business of the complainant nor of the wholesaler, but only to prevent competition between retailers. Covenants protecting the seller of property against the competition of the buyer, by its use against the business retained by the seller, which are upheld if not wider than necessary for that purpose, have been covenants where the main purpose has been to protect the seller himself against competition directed against his retained business. No instance has been called to our attention where the main purpose and principle, if not only result, is to protect buyers against the competition of each other. If such a principle shall find lodgment in the law, it must be upon economic reasons which are in conflict with those which now prevail. The single direct effect of the "system of contracts" is to limit and restrain the right of each wholesaler and each retailer to transact business in the ordinary way. Each obtains a price enhanced by the "system" over the "cut rate" or "cut price" method which had before prevailed, and which it was the object of the new plan to abolish. It may be that sales went on as before; but at a higher price to the consumer than would otherwise have been paid. In Addyston Pipe Co. v. United States, 175 U. S. 211, 244, 20 Sup. Ct. 96, 44 L. Ed. 136, it was said:

"We have no doubt that where the direct and immediate effect of a contract or combination among particular dealers in a commodity is to destroy competition between them and others, so that the parties to the contract or combination may obtain increased prices for themselves, such contract or combination amounts to a restraint of trade in the commodity, even though contracts to buy such commodity at the enhanced price are continually being made. Total suppression of the trade in the commodity is not necessary in order to render the combination one in restraint of trade. It is the effect of the combination in limiting and restraining the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded."

It is no answer to such restrictive covenants that after all they only prevent injurious competition between such dealers and only result in maintenance of reasonable prices. These are not the tests by which the validity of such agreements are determined. In People v. Sheldon, 139 N. Y. 251, 264, 34 N. E. 785, 789, 23 L. R. A. 221, 36 Am. St. Rep. 690, it was said:

"If agreements and combinations to prevent competition are or may be hurtful to trade, the only sure remedy is to prohibit all agreements of that character. If the validity of such an agreement was made to depend upon an actual proof of public prejudice or injury, it would be very difficult in any case to establish the invalidity although the moral evidence might be very convincing."

This principle was very strongly approved by this court in the Addyston Pipe Case, so frequently referred to, and many other cases cited in its support. It has been suggested that we should have regard to new commercial conditions and a tendency toward a relaxation of old common-law principles which tend to prevent development on modern lines. This is an argument better addressed to legislative bodies than to the courts. Neither is it wise for the courts to countenance the introduction of artificial distinctions dependent upon the variant economic views of individual judges. Distinctions which are specious or analogies which are but apparent will but afford opportunities to whittle away broad economic principles lying at the bottom of our public policy, principles which have long received the sanction of statesmen and the approving recognition of a long line of jurists. A like argument is expected whenever some new method of circumventing freedom of commerce comes under the tests of the law. It was made and answered by Judge Taft in the Addyston Pipe Case with a strength to which we can add nothing.

Our conclusion is that complainant's system of contracts is not enforceable. The injunction must be discharged.

The case will be remanded, with directions to proceed as may be consistent with this opinion.